## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FILED**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | MAY 0 3 2007 |
| | : | |
| v. | : | **Cr. No. 07-095 (RJL)**   NANCY MAYER WHITTINGTON, CLERK U.S. DISTRICT COURT |
| | : | |
| **DOUGLAS F. GREER,** | : | |
| | : | **VIOLATION : 18 U.S.C. §1347 (Health** |
| | : | **Care Fraud); 26 U.S.C. § 7206(1) (False** |
| **Defendant** | : | **Income Tax :Return)** |

### STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, defendant **DOUGLAS F. GREER** agrees and stipulates as follows:

HEALTH CARE FRAUD

1.    Defendant **DOUGLAS F. GREER** is a medical doctor with a practice specialty in ophthalmology.  He provides medical services for patients in the District of Columbia and the Commonwealth of Virginia.  All insurance claims, however, are prepared and processed in the main office, located at 3301 New Mexico Avenue, N.W., Suite 214, Washington, D.C.

2.    Since approximately 1981, defendant **DOUGLAS F. GREER** has been a participating provider in the Medicare Program.  Medicare is a federal health care program that provides basic medical coverage for persons age 65 and over who are entitled to retirement benefits and for persons under age 65 who suffer from certain disabilities.  The United States funds 100% of Medicare, which is administered by the United States Department of Health and Human Services.   Medicare is a health care benefit program as defined by 18 U.S.C. §§ 24 and 1347.  Between 1999 and 2002, defendant **DOUGLAS F. GREER** provided services to 429 Medicare beneficiaries.

3.    Medicare uses a "fee schedule" to determine the amount it will pay for any given medical service (called the "allowable"). Medicare pays 80% of the fee schedule amount and the patient is responsible for paying the remaining 20% (also known as "co-payment"). Medicare beneficiaries can obtain private secondary insurance to cover these co-payment amounts or they must pay the co-payments out of their personal funds.

4.    In addition to Medicare, defendant **DOUGLAS F. GREER** submitted claims for patients whose services were covered under the Federal Employee Health Benefit Plan (FEHBP), a federally-funded health benefit program for some twelve million federal employees, retirees and their dependents. The United States Office of Personnel Management (OPM) is the federal agency responsible for contracting with third party insurers to administer health benefits to its members. Defendant **DOUGLAS F. GREER** received payments under FEHBP from the following third party insurers: Aetna, Blue Cross Blue Shield, Mail Handlers Benefit Program, GEHA, and National Association of Letter Carriers. Defendant **DOUGLAS F. GREER** also submitted claims to Aetna, Cigna, Guardian and United Health Care for patients who were not covered under FEHBP. All of these insurance plans are considered health care benefit programs as defined by 18 U.S.C. §§ 24 and 1347. Between 1999 and 2002, defendant **DOUGLAS F. GREER** provided services to approximately 778 subscribers of these various insurance programs.

5.    To obtain reimbursement from Medicare or one of these other insurance carriers, health care providers, including ophthalmologists, indicate the type of services provided by using five-digit codes listed in the Physician's Current Procedural Terminology ("CPT") Code Book, a publication of the American Medical Association. In addition to designating a particular code

number for office visits, diagnostic tests and surgical procedures, the CPT provides a description

of the services.  Ophthalmological services are grouped together.  Non-surgical services are

further divided into "general" and "special."  General Ophthalmological services include two

levels of eye examinations: intermediate (CPT 92002 for new patient or CPT 92012 for

established patient) and comprehensive (CPT 92004 for new patient or CPT 92014 for

established patient).   Both levels of eye examinations are "integrated services, in which the

medical decision making cannot be separated from the examining techniques used."

6.     Additional diagnostic tests are grouped under "special ophthalmolgical services"

and may be performed and billed separately where a more intensive evaluation of a particular eye

structure or function is medically necessary.  Medicare and private insurance programs publish

more detailed guidelines for some general and special ophthalmological services, describing

when and how often these services are medically appropriate and will be approved for payment.

7.     According to these sources, the following diagnostic procedures are generally only

medically indicated for patients suspected of or suffering from glaucoma: (1) taking multiple

intraocular pressure readings throughout the day (Serial Tonometry - CPT 92100); (2) comparing

intraocular pressure before and after dilation (Provocative Test - CPT 92140); (3) measuring the

patient's angles (Gonioscopy - CPT 92020); and (4) determining if there is any peripheral vision

loss  (Visual Field - CPT 92081-83).   Defendant **DOUGLAS F. GREER,** however, routinely

submitted claims for these procedures for most of his patients regardless of their medical

conditions.  Yet, based upon the diagnostic codes submitted by defendant **DOUGLAS F.**

**GREER** with these claims, only 23% of the payments he received were for performing these

procedures on patients whom defendant **DOUGLAS F. GREER** suspected were at risk for

3

developing glaucoma or already suffered from the disease. Accordingly, defendant **DOUGLAS F. GREER** fraudulently obtained $282,018 from Medicare and the other insurance programs for these medically unnecessary services.

8.    During the years 1999 through 2002, defendant **DOUGLAS F. GREER** also routinely billed for conducting an extensive study of the back (fundus) of his patients' eyes with an instrument known as an indirect ophthalmoscope (Extended Ophthalmoscopy - CPT 92225). First, this procedure is considered medically indicated for patients suspected of suffering from serious internal eye disorders, particularly those involving the retina. Yet, only 17% of the Extended Ophthalmoscopy claims submitted by defendant **DOUGLAS F. GREER** for reimbursement related to patients suffering from such disorders. Second, the CPT Manual and the local Medicare Carrier specifically require a detailed drawing of the patient's retina as an essential element of the procedure. Because defendant **DOUGLAS F. GREER** failed to make such drawings even where the procedure may have been warranted, he did not perform the service for any of the patients for which he sought reimbursement. By submitting these fraudulent claims to Medicare and the other government insurance programs, defendant **DOUGLAS F. GREER** wrongfully obtained $141,889.

9.    In addition, defendant **DOUGLAS F. GREER** often billed for photographs of the back of the patient's eye (Fundus Photography CPT 92250). These photographs are considered a useful tool in documenting the progression of various ocular diseases, but need not be repeated often since noticeable changes in the fundus are slow to occur. Indeed, defendant **DOUGLAS F. GREER** retained a professional ocular photographer who used the most technologically advanced equipment to take these photographs. In addition to the photographs taken by the

4

ocular photographer, defendant **DOUGLAS F. GREER** submitted claims to Medicare and the

other insurance carriers for photographs defendant **DOUGLAS F. GREER** took with a handheld

camera. Unlike the professional's equipment, this handheld camera often failed to produce

images or produced images of such poor quality that defendant **DOUGLAS F. GREER** could

not have used them for any diagnostic purpose. Since the CPT requires defendant **DOUGLAS

F. GREER** to make an interpretation and report based upon the images, he simply could not

have performed this service with respect to all the photographs he claimed to have taken.

Accordingly, for the years 1999 through 2002, defendant **DOUGLAS F. GREER** fraudulently

obtained another $88,686 for services he did not render.

     10.    Defendant **DOUGLAS F. GREER** billed Medicare and the above referenced

insurance carriers for numerous ocular surgeries. The vast majority of these surgeries related to

cataracts and glaucoma.

     11.    A cataract is an abnormality of the eye, characterized by opacity of the lens; that

is, cloudiness which can interfere with normal vision. For the years 1999 through 2002,

defendant **DOUGLAS F. GREER** surgically removed 136 cataracts through a process known as

phacoemulsification (CPT 66984). Once the cataract is removed, an artificial lens (IOL) is

implanted to perform the same function as the human lens. The surgery is considered routine

with few risks of complications. On rare occasions, in approximately one in 1000

phacoemulsification operations, excessive heat can cause a burn to the white part of the eye (the

scleral), requiring a graft (CPT 67255). In order to increase his billings, defendant **DOUGLAS

F. GREER** falsely claimed that during 108 of these surgeries, he was required to perform a

scleral graft to mend the wound. As a result, he fraudulently sought reimbursement and obtained

5

$37,022 from Medicare and the other insurance programs.

12.    After the removal of the human lens and the insertion of an IOL, approximately half of all cataract patients develop a secondary membrane in the eye, which can become opacified, causing cloudiness in the vision.  An ophthalmologist can treat this condition by making a hole in the opacified lens capsule with a Yttrium Aluminum Garnet (YAG) laser to create a pathway through which light can pass through to the retina (Capsulotomy - CPT 66821) Even if opacification occurs, it is not considered medically necessary to perform a Capsulotomy unless a patient suffers from a limitation on pursuing daily living activities.  It is seldom medically necessary to perform this procedure less than three months following cataract surgery. In fact, if performed within this time period, Medicare requires its providers to submit documentation with their claims for reimbursement to support medical necessity.  Further, Capsulotomies rarely need repeating.

13.    For the years 1999 through 2002, defendant **DOUGLAS F. GREER** sought reimbursement from Medicare and the other insurance carriers for performing Capsulotomies on approximately 89% of his cataract patients.  He purportedly performed 82 of these Capsulotomies within three months of cataract surgery, fraudulently circumventing the medical necessity documentation requirement by appending modifier 79 to all these claims, falsely certifying that these Capsulotomies were unrelated to the original cataract surgery.  As a result, he received $9,848 for which he was not entitled to.  Moreover, defendant **DOUGLAS F. GREER** billed for repeating this laser procedure after the three month period on many of his patients, fraudulently obtaining an additional $10,348.

14.    Glaucoma refers to a group of diseases that have in common optic nerve damage

6

with associated visual field loss for which elevated pressure within the eye (intraocular pressure or IOP) is one of the primary risk factors. Eyes produce a watery fluid (aqueous humor), which flows through the pupil and behind the cornea, draining out through a mesh-like pathway (trabecular) and into the bloodstream. When the fluid can not drain properly, IOP increases which can cause damage to the optic nerve. Once a sufficient number of nerve cells are destroyed, "blind spots", or scotomas, begin to form in the field of vision. Typically, these scotomas first appear in the peripheral field. Later, the central vision can be affected. Once visual loss occurs, it is irreversible.

15.     The most prevalent type of glaucoma is primary open angle ("POAG") where the anterior chamber angle is open, but the trabecular meshwork is not draining properly. Topical medication is the most widely used method for treating POAG. Argon Laser Trabeculoplasty ("ALT" - CPT 65855) is an alternative method used to reduce IOP and prevent further optic nerve damage. With the use of an argon laser beam, an ophthalmologist creates openings in the trabecular meshwork, resulting in an increase of the aqueous outflow. Since ALTs can not be repeated, it is the accepted medical practice to treat just half of the trabecular meshwork - 180 degrees - with laser spots. If successful, the pressure lowering effect can last for several years at which time a second ALT can be performed to the opposite half of the trabecular meshwork.

16.     For the years 1999 through 2002, defendant **DOUGLAS F. GREER** sought reimbursement for performing ALTs from Medicare and the other insurance programs for patients who clearly did not need this service since they were not suffering from POAG. As a result, he fraudulently obtained $39,726 from Medicare and the other insurance programs for these ALT procedures that he either did not perform or performed on patients who did not

7

require them. Further, for some patients defendant **DOUGLAS F. GREER** billed more than the

maximum number of ALTs that can or should be performed on any one patient. As a result,

defendant **DOUGLAS F. GREER** fraudulently obtained an additional $111,652 from Medicare

and the other insurance programs for services that he either did not perform or performed without

medical necessity.

      17.     Primary angle closure ("PAC"), a rarer form of glaucoma, occurs when the

trabecular meshwork functions properly, but is blocked by the iris, preventing the flow of

aqueous humor from the eye. A Laser Iridotomy (CPT 66761) is an effective surgical procedure

to treat PAC. With a focused beam of light, a small hole is created in the outer edge of the iris,

allowing aqueous fluid to flow from behind the iris directly to the anterior chamber of the eye.

Because an acute attack can occur suddenly for patients with anatomically narrow angles, it is

medically reasonable to perform a Laser Iridotomy prophylactically before any signs of glaucoma

manifest. Once performed, repeating the procedure is unnecessary unless the hole previously

created by the laser closes.

      18.     For the years 1999 through 2002, defendant **DOUGLAS F. GREER** claimed that

he performed hundreds of Laser Iridotomies. Yet, a very small number of these procedures were

actually performed on  patients who either suffered from PAC or had anatomically narrow

angles. As a result, defendant **DOUGLAS F. GREER** fraudulently obtained $103,767 from

Medicare and the other insurance programs for submitting bills for procedures that were

medically unnecessary.

      19.     Where Laser Iridotomies can not be used or fails to open a closed angle, another

procedure known as a Laser Iridoplasty (CPT 66762) can be performed. During this procedure,

an ophthalmologist uses a laser to mechanically pull the iris away from the trabecular meshwork. For the years 1999 through 2002, defendant **DOUGLAS F. GREER** submitted claims to Medicare and the other insurance programs, seeking reimbursement for performing more than one thousand Laser Iridoplasties. Again, a very small percentage were actually performed on patients who allegedly suffered from PAC or had anatomically narrow angles. As a result, defendant **DOUGLAS F. GREER** fraudulently obtained $186,511 from Medicare and the other insurance programs for submitting bills for procedures that were medically unnecessary.

20.     In total, as a result of his scheme to defraud Medicare and these other insurance programs, defendant **DOUGLAS F. GREER** wrongfully obtained $1,011,467.

TAX FRAUD

21.     For the most part, expenses of the medical practice were paid by check or with an American Express card. In addition to making business related purchases, the credit card was used to make purchases of a personal nature. These purchases varied from everyday living expenses - groceries, dry cleaning, cable and telephone services for their residence, health and beauty supplies and treatment - to large ticket items, such as, family vacations. False entries were made in the corporate records, claiming these credit card purchases were for a variety of business related purposes. For instance, groceries and meals at local restaurants often were booked as general office expenses. Similarly, corporate checks were used for purchases or services for the benefit of defendant **DOUGLAS F. GREER's** family benefit and were falsely entered in the corporate accounting system as business expenses. For example, in 2000, Florence Everetts was paid by corporate check in the amount of $620.82 for landscaping services performed at the Greer family home. This payment was booked in the corporate records as a

payment for "professional fees."

22.     For the years 2000, 2001 and 2002, the same accountant prepared the federal and

District of Columbia corporate returns for the medical practice and the individual income tax

returns for defendant **DOUGLAS F. GREER**.  The accountant relied upon the corporate

accounting entries to determine the corporation's deductible expenses.  The accountant, where

appropriate, subtracted the amounts booked as business expenses from the corporation's gross

income to calculate taxable income.   In other words, the payment of personal expenses with

corporate funds fraudulently reduced the corporation's tax liability for each of these tax years.

23.     The medical practice's payroll was another deductible business expense  that

reduced the corporate taxable income.  Defendant **DOUGLAS F. GREER** added his two

children to the corporate payroll and began paying them substantial salaries for performing work

of little value.  For the years 2000, 2001 and 2002, the Greer children's salaries totaled $76,881.

The Greer children never exercised dominion and control over these funds, which were deposited

into their parent's accounts or into custodial accounts.  The monies deposited into the custodial

accounts were used to pay the children's private school tuition.

24.     Further, in 1996, defendant **DOUGLAS F. GREER** added his housekeeper to the

payroll.  For the years 2000, 2001 and 2002, the housekeeper's salary totaled $10,343 even

though she performed no appreciable work on behalf of the medical practice.

25.     Completely aware of these false corporate entries upon which the accountant

relied in preparing the federal and District of Columbia corporate income tax returns, defendant

**DOUGLAS F. GREER** willfully subscribed under penalties of penalty of perjury to his medical

practice's corporate returns for tax years 2000, 2001 and 2002, that he knew included false and

fraudulent deductions for business expenses. As a result of these fraudulent deductions, Douglas F. Greer, MD, PC understated the amount of federal and District of Columbia taxes due and owing by $55,324 and $15,766, respectively.

26.     At the end of each calendar year, defendant **DOUGLAS F. GREER** received as compensation a portion of the medical practice's profits. These amounts were included in his Wage and Earning statements (Forms W-2). The payment of personal expenses by the corporation and the amounts paid to his children and housekeeper also should have been included and reported as income on his individual income tax returns. By failing to do so, defendant **DOUGLAS F. GREER** willfully subscribed under penalties of penalty of perjury to his individual federal and District of Columbia income tax returns for tax years 2000, 2001 and 2002, that he knew understated his income.

27.     In addition to understating his income, defendant **DOUGLAS F. GREER** took $56,000 in charitable contributions that he knew he was not entitled to. In 1980, defendant **DOUGLAS F. GREER** incorporated International Vision, Inc., a non-profit organization, "to detect, prevent and treat blinding eye diseases in needy countries through instruction, eye care and treatment." For many years, defendant **DOUGLAS F. GREER** claimed that he performed charitable work for International Vision while he and his family vacationed in the Cayman Islands. Even though defendant **DOUGLAS F. GREER** provided medical care to indigent patients in the Cayman Islands, he knew that the majority of expenses incurred during these vacations were for his family's benefit and not in furtherance of the charitable purpose for which he obtained International Vision's exempt status. In reality, the monies "donated" to International Vision were to pay his own personal expenses and not that of the charity.

11

28.    By failing to report approximately $176,077 income and taking these false and fraudulent charitable deductions, defendant **DOUGLAS F. GREER** filed materially false and fraudulent federal and District of Columbia individual income tax returns for 2000, 2001 and 2002, resulting in an additional tax due and owing of $92,320 to the federal government and $37,115 to the District of Columbia government.

_____
DOUGLAS F. GREER,  Defendant

12