# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **Cr. No. 07-00095 (RJL)** |
| | **:** | |
| **DOUGLAS F. GREER,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

---

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Comes now the United States, by its attorney, the United States Attorney for the District of Columbia, and submits this Memorandum in Aid of Sentencing. As is set forth more fully below, the government respectfully requests the Court to sentence defendant to a 51 month term of imprisonment and order him to pay full restitution.

## I.    SUMMARY

Defendant Douglas Greer is more than a thief. He is an embarrassment to the medical profession. Educated and trained at the finest and most prestigious American universities and hospitals, defendant forsake the medical profession's long subscribed ethical commitment to the care of his patients. To enrich himself and his family, defendant caused his patients to needlessly suffer. In addition to the fees they paid him through co-pays and non-covered charges, his patients wasted precious time, needlessly worried about sight impairment, and physically endured uncomfortable and sometimes painful procedures that were not required for their care. A lengthy term of incarceration is necessary and appropriate to punish him and deter other physicians from putting the love of money before their legal and ethical obligations to their patients and society as a whole.

In addition to stealing from the government's Medicare and federal employee health plans and numerous private insurance carriers, defendant engaged in tax fraud. He refused to pay his fair

share in taxes. The criminal tax laws are designed to protect the public interest by preserving the integrity of the nation's tax system. As a citizen of the United States and a resident of the District of Columbia, defendant had an obligation to honestly report his earnings and take only those deductions he was entitled to. Instead, defendant engaged in a systematic course of conduct to dishonestly reduce his tax liability. Defendant deducted salaries paid to his children and housekeeper as business expenses of his medical practice, improperly claimed personal expenditures as expenses of his medical practice, and misused a charitable organization for his personal benefit. A lengthy term of incarceration and an order of restitution is also necessary and appropriate to punish him for this conduct and deter other citizens from this criminal behavior.

## II.    **OFFENSE CONDUCT**

During the plea proceedings, defendant agreed with the Statement of Offense submitted to the Court by the government, which has been incorporated into the Presentence Investigation Report ("PSI"). See PSI at ¶¶ 1-28. In summary, defendant admitted billing for diagnostic and surgical procedures that he either did not provide to patients or were not medically necessary. He also admitted filing false corporate and individual income tax returns with the United States and District of Columbia. In these false documents, defendant (1) understated his corporate income through inappropriate business expenses; (2) failed to report as income expenditures using corporate funds for personal benefit; (3) improperly deducted salaries paid to his children and housekeeper as business expenses incurred at the medical practice and (4) claimed charitable contributions to a not-for-profit organization for expenses incurred during family vacations in the Cayman Islands.

III.    **FEDERAL SENTENCING GUIDELINES**

In determining the offense level calculations under the Federal Sentencing Guidelines, the parties agreed that certain provisions applied.  With respect to the health care conviction, the parties agreed that based upon a loss of more than $1,000,000, Section 2B1.1(a) and (b)(1)(H) provides for a total offense level of 22.  With respect to filing a false tax return, the parties agreed that Section 2T1.1 provides for a total offense level of 16 based upon a tax loss greater than $80,000.  The parties disagreed, however, as to whether defendant's offense conduct should be increased by two levels under Section 3B1.3 for his abuse of a position of trust and/or use of a special skill.  The parties also disagreed as to whether the counts of conviction should be grouped, resulting in an additional level increase under Section 3D1.4.[1]

A.    **Abuse of Position of Trust**

It is United States Probation Officer Kelli Griffin Cave's position that defendant's offense level should be increased by two levels for abusing a position of trust.  Section 3B1.3 of the Sentencing Guidelines provides in pertinent part as follows:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.

Defendant abused the trust given to him by Medicare and the other insurance carriers to honestly seek reimbursement only for medical services that he actually rendered or necessary for the care of his patients.  He also abused the trust bestowed upon him by his patients who depended upon his expertise to examine, diagnose and treat them in a manner consistent with their best interests.

---

[1]    Defendant agreed that he would not seek any downward departure outside offense level 22 for any reason.

3

Defendant entered into contractual relationships with Medicare and the private insurance carriers to provide quality health care to its members. As a provider, defendant agreed to abide by the carriers' policies and procedures, including coverage limitations as to when and upon whom procedures are performed. He was obligated to maintain accurate medical records and to submit accurate claims. Unable to review every medical file or examine every patient, Medicare and the insurance carriers relied upon defendant's special skills, including his ability to diagnose illnesses and write reports. Medicare and others relied upon his representation that the procedures for which he billed were in fact performed and medically necessary. As a result, defendant was in a position with "substantial discretionary judgment that is ordinarily given considerable deference" and was "subject to significantly less supervision." See U.S.S.G. §3B1.3, comment (n.1). Accordingly, the enhancement applies.

Numerous courts have agreed that the abuse of a position of trust enhancement is appropriate where an unsupervised doctor commits billing fraud against insurance companies. See United States v. Hoogenboom, 209 F.3d 665, 671 (7th Cir. 2000) (psychologist billed for services not rendered to elderly patients in retirement homes subject to enhanced sentence); United States v. Sherman, 160 F.3d 967, 970 (3d Cir.1998) (doctor subject to enhancement because his position allowed him to commit a wrong that was difficult to detect, and insurer deferred to his professional discretion); United States v. Ntshona, 156 F.3d 318 (2nd Cir. 1998) (doctor abused fiduciary relationship with Medicare and patients); United States v. Rutgard, 116 F.3d 1270, 1293 (9th Cir. 1997) (ophthalmologist who billed Medicare for unnecessary services subject to enhanced sentence because "the government as insurer depends upon the honesty of the doctor and is easily taken advantage of if the doctor is not honest."); United States v. Adam, 70 F.3d 776, 782 (4th Cir. 1995) (enhancement

4

appropriate because physician making Medicare claims enjoys position of trust allowing him to commit difficult-to-detect wrongs).

## B.      Grouping Health Care and Tax Fraud Counts

Officer Cave also determined that these offenses should not be grouped together. See PSI at ¶¶ 39 through 45. Part D of the Sentencing Guidelines provides for grouping of offenses "to limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct." See U.S.S.G. Ch.3, Pt.D, intro. Comment. Yet, these charged offenses do not involve "substantially the same harm" and should not be grouped together.

First, these fraud schemes involve different victims. See Section 3D1.2 (a). The victims of defendant's health care fraud scheme are the health care providers and the patients. Whereas, the victims of defendant's tax fraud scheme are the federal and District of Columbia treasuries and the collective citizenry. Second, the schemes are not "connected by a common criminal objective or constituting part of a common scheme or plan" nor is the conduct of one a "specific offense characteristic" of the other. See Section 3D1.2 (b) & (c). Although both crimes share defendant's common objective of unjust enrichment and are both motivated by greed, the manner in which he committed these crimes clearly reflect separate schemes. Finally, these offenses are not "of the same general type" to meet the grouping criteria. See Section 3D1.2, comment., (n.6). They involve completely different conduct. To commit health care fraud, defendant fraudulently obtained monies he was not due by repeatedly submitting false claims to the government, private insurances and individual. The tax fraud violations, on the other hand, resulted from defendant's intentional failure to honestly report and pay monies he owed.

The Court of Appeals for the District of Columbia Circuit, in United States v. Braxtonbrown-Smith, specifically held that tax offenses should not be grouped with health care offenses. 278 F.3d 1348, 1356 (D. C. Cir.), cert. denied, 536 U.S. 932 (2002). Braxtonbrown-Smith, like defendant, used monies from her company, some of which were fraudulently obtained for health care services she never provided, to pay her personal expenses. Chief Judge Hogan refused to group the counts because he found that these offenses involved different victims. Id.

Numerous other courts have similarly held that it is inappropriate to group fraud and tax offenses because they involve different victims, different harms, and different conduct. See United States v. Martin, 363 F.3d 25, 41-44 (1st Cir. 2004) (district court erred by grouping tax and fraud counts that were not closely related); United States v. Peterson, 312 F.3d 1300, 1304 (10th Cir. 2002) (grouping inappropriate because "tax evasion and mail fraud are not closely related" because the offenses involve different victims, behaviors and harms); Weinberger v. United States, 268 F.3d 346, 355 (6th Cir. 2001) (grouping inappropriate because the "fraud counts and the tax count consisted of different elements, affected different victims and involved different criminal conduct"); United States v. Lindsay, 184 F.3d 1138, 1142 (10th Cir.) (mail fraud and tax evasion should not be grouped because the victims and mischief differ), cert. denied, 528 U.S. 981 (1999); United. States v. Vitale, 159 F.3d 810, 813-15 (3rd Cir. 1998) (grouping inappropriate because wire fraud and tax evasion counts "involve different victims ... different harms and different types of conduct.").

Grouping is also inappropriate under U.S.S.G. § 3D1.2(d). Although sentences for both offenses are derived based on the amount of loss, they are not "the same general type" of crime. U.S.S.G. § 3D1.2 cmt. N.6. As the First Circuit noted in Martin, the offense levels are based on different loss tables that increase "at different increments for tax and fraud offenses." 363 F.3d at

6

44; compare U.S.S.G. §§ 2B1.1 & 2T4.1. The First Circuit explained that these different increments "reflect the different nature of the crimes, basing the offense level for fraud counts on the amount of loss to the victim and the offense level for tax evasion counts on the tax loss to the government." Id.; see also United States v. Shevi, 345 F.3d 675, 680-81 (8th Cir. 2003) (grouping inappropriate under §3D1.2(d) because the loss tables for fraud and tax offenses punish the same amount of loss differently), cert denied, 540 U.S. 1166 (2004); but see United States v. Gordon, 291 F.3d 181, 192 (2d Cir. 2002) (grouping of tax and fraud counts inappropriate under §3D1.2(c), but appropriate under §3D1.2(d)).

Were these offenses grouped, defendant will avoid any punishment for committing tax offenses. The multiple count rules were specifically enacted to prevent such an injustice by providing "incremental punishment for significant additional criminal conduct." See U.S.S.G. Ch.3, Pt.D, intro. Comment. In order to assure that defendant is punished for commission of these tax crimes, an additional level should be added resulting in a total offense level of 25.

## C.   **Acceptance of Responsibility**

Pursuant to the plea, the government agreed that defendant is entitled to a three point decrease to the offense level pursuant to Section 3E1.1(b)(2). With an offense level of 22, defendant's guideline range is 41 to 51 months incarceration.

## IV.    18 U.S.C. § 3553 FACTORS

Furthermore, the factors set forth at 18 U.S.C. § 3553 should compel this Court to impose a 51 month period of incarceration and order restitution in the amounts agreed to by the parties.[2]

### A.    The Nature and Circumstances of the Offense

The practice of medicine is a privilege which carries important responsibilities. As a medical professional, defendant's primary concern should have been to his patients. More than 1,000 patients placed their trust in him to provide competent medical care. They relied on to defendant to care for the eyes; to honestly advise them of medical conditions; to alert and educate them of possible treatments; to allow them to make informed decisions regarding their care; to maintain accurate and thorough medical records; and to appropriately bill for medical procedures that were

---

[2]    As this Court is aware, the district court needs to consider the goals of Section 3553 in determining the appropriate sentence, however, the court is not required to specifically refer to each factor listed in § 3553(a). See United States v. Ayers, 428 F.3d 312, 315 (D.C. Cir. 2005). Section 3553(C) provides that the court at the time of sentencing shall state in open court the reasons for its imposition of a particular sentence. Section 3553 specifically sets out the factors to be considered: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective matter; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the . . . offense . . . as set forth in the guidelines . . . (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

actually performed.  Indeed, the trust defendant enjoyed as an ophthalmologist was heightened by the vulnerability of his patients who were fearful of losing their eyesight and yet unable to monitor the procedures performed.[3]

In complete disregard for his patients' welfare, defendant sought to maximize his profits. To justify the use and frequency of various diagnostic and surgical procedures, defendant regularly diagnosed his patients with ocular ailments despite their actual ocular health.  There is ample evidence to suggest that these diagnoses were made to generate payments for non-reimbursed procedures.  For example, one of defendant's Medicare patients initially visited him in March 2000 for an annual check-up.  Between March 2000 and October 2001, this patient visited defendant 26 times.  She was diagnosed with various ailments, including closed angle glaucoma.  During this short period, defendant billed Medicare for 30 different laser procedures allegedly necessary to treat both

---

[3]    In October 2004, Congress passed the Crime Victims' Right Act, which established new rights for victims in criminal proceedings, including the right to be reasonably heard at the time of sentencing.  Although most of defendant's patients were not personally contacted by the government during the investigation and were unaware of his criminal conduct, they are considered victims.  See United States v. Burgos, 137 F.3d 841 (5th Cir. 1998) (patients of psychiatrist who billed for services not rendered are victims for purpose of vulnerable victim enhancement under the Guidelines); cert. denied, 525 U.S. 1085 (1999); United States v. Rutgard, 116 F.3d at 1293 (patients of ophthalmologist who performed, among other things, unnecessary cataract surgeries, were vulnerable victims); United States v. Bachynsky, 949 F.2d 722 (5th Cir. 1991) (patients of physician who charged insurance companies for unnecessary medical tests are victims since they were given false information regarding their medical status and some made payments due to deductibles and copayments). cert. denied, 506 U.S. 850 (1992).  Accordingly, the government notified those patients whose addresses were provided by Medicare and some of the private insurance carriers that defendant had pled guilty to health care fraud.  See Exhibit 1.  The government attached the victim impact form that it uses for all types of crimes.  Of the more than 1,000 letters, 123 were returned as undeliverable.  The government was notified by a number of individuals who received the letter that defendant's patients had passed away.  77 patients informed the government that they did not wish to make a statement. All of the letters of the patients who responded are included in Exhibit 1 (filed under seal).

open and closed glaucoma.  A physical examination of this patient, however, conducted by Dr.

Joseph Kubacki, the Chairman of Ophthalmology at Temple University, in November 2006, revealed

that her angles were open and her optic nerves were normal.[4]  In other words, this Medicare recipient

did not suffer from glaucoma, and never needed  30 laser procedures.

On October 8, 2002, an Aetna beneficiary had an initial appointment with defendant.  She

completed the patient registration form and listed as her "chief ocular complaint" a condition known

as a pinguecula.  Noticing a yellowish-brown growth on the white part of her eye, this patient was

encouraged by her optometrist to see an ophthalmologist.  This was so even though treatment is not

typically necessary unless the pinguecula becomes inflamed.  After defendant confirmed her

diagnosis of pinguecula, defendant then falsely diagnosed her with a having a more serious

condition, known as a pterygium.  Defendant scheduled this patient to return for additional visits and

encouraged her to have surgery.[5]  Luckily, this patient did not heed to defendant's advice.  She

decided against surgery and terminated her relationship with defendant.[6]

Defendant performed 136 cataract surgeries during the prosecution period.   It would be

difficult, if not impossible, to determine through physical examinations which of these patients

---

[4]        This patient continued to see defendant on a regular basis.  Interestingly, after April
12, 2002, no more laser procedures were billed and her diagnoses improved from actually suffering
from glaucoma to only a glaucoma suspect.

[5]        The patient's medical records reflect that one of defendant's employees telephoned
her insurance carrier to determine the reimbursement amount for performing a pterygium excision
and whether a referral or pre-certification was required.

[6]        Dr. Kubacki examined this patient and found no evidence of a pterygium.  According
to Dr. Kubacki, a first year medical student should know the difference between a pinguecula and
a pterygium.

actually required surgery. Over the course of a long life, almost everyone will eventually develop cataracts or some lens opacity in their eyes. When and if to remove the cataracts depends upon the individual needs and condition of the patient. Medicare has concluded that cataract surgery is medically necessary when the patient's visual acuity has diminished sufficiently to interfere with that particular patient's normal everyday activities. For many patients, there is no need to rush into surgery. A number of patients, however, informed the government that defendant pressured them to have surgery. Several, who fortunately chose to seek a second opinion, learned that they either did not have cataracts or surgery was not required at that particular time.

According to the government expert, in addition to the cataract surgeries, defendant's records indicate that he performed far too many YAG laser capsulotomies. Patients who have cataract surgery sometimes develop a posterior capsule. Sometimes that condition requires surgery, however, it is not a foregone conclusion every time. If the opacification does not impair patient's vision then the procedure is not considered medically necessary. The patient charts reviewed by Dr. Kubacki lacked documentation as to the medical necessity for this procedure. Dr. Kubacki noted that the complaints he reviewed in the charts were typical for post-operative patients and acuity results for these patients were within the normal range.

Despite his protestations to the contrary, the evidence clearly demonstrates that defendant knew precisely what he was doing. He is a well educated member of the most prestigious medical associations. He regularly attended medical seminars, subscribed to ophthalmological journals, periodically received Medicare and private insurance carrier guidelines and socialized with members of his profession. The insurance reimbursement rules were not too difficult for him to understand. He simply chose to ignore them.

The most persuasive evidence that defendant knowingly and intentionally sought reimbursement for procedures he either did not provide or were not medically necessary, is his repeated effort to disguise his fraudulent billing scheme. On three different occasions, private insurance carriers suspected irregularities in his billings and sought to review defendant's claims. Completely aware that the requested files would not withstand scrutiny, defendant altered them by adding information which was intended to justify the billings.

The first instance of this conduct occurred before the prosecution period, but is related to one of the procedures highlighted in the Statement of Offense. On April 28, 1997, Blue Cross Blue Shield of the National Capital Area requested the medical records for three patients who had purportedly undergone YAG capsulotomies following cataract surgeries. See Exhibit 2 (filed under seal). In response to the request, defendant's wife, in her capacity as Office Manager, mailed the requested files. See Exhibit 3 (filed under seal).

At the government's request, United States Secret Service document analyst Gerald LaPorte reviewed the handwritten pages submitted to Blue Cross. Based upon his examination, he concluded that different inks were used on these pages, including three black non-ballpoint pens and one black ballpoint pen. See Exhibit 4 (filed under seal). With the use of a Video Spectral Comparator, which utilizes a variety of illumination sources and filters, Mr. LaPorte concluded that the same black ballpoint pen was used to make entries on a medical record dated May 6, 1994 and another dated February 15, 1995. See Exhibit 5 (filed under seal).[7] The other entries on these pages were made

---

[7]    When viewed under this machine, different inks will often exhibit different characteristics due to their varying chemistry. Specifically, depending on the physical and chemical properties of writing inks, they will absorb, reflect or transmit illumination differently.

with a black non-ballpoint pen.  These black ballpoint entries specifically relate to the YAG laser procedure under review.  Importantly, the entry on questioned document 25 referred to the patient's "cc," chief complaint.  The note referred to problems with vision and glare - factors relating to the patient's ability to function.  This information would have been critical for Blue Cross in determining whether it was medically necessary to perform this procedure.

In the Fall of 2000, Pioneer Eye Care attempted to conduct an on-site audit on defendant's billing practices on behalf of insurers Aetna and Cigna.  The day before the scheduled audit, defendant's wife wrote him the following note: "All these charts could be up for grabs.  Have you looked over the list?"  See Exhibit 6.  Neither defendant nor his wife were present for the audit.  Instead, a part-time employee met with Pioneer's nurse.  That employee was specifically instructed not to permit Pioneer to review more than 10 patient files.  When the Pioneer nurse asked to see additional files, defendant's employee refused to produce them.    Several weeks later, after conversations between defendant's wife and a Pioneer supervisor, defendant provided five additional patient files for review.  Although Pioneer made no finding of fraud, it concluded that defendant had been paid for services that were not covered, not performed or not performed to the level billed.  Defendant agreed to Pioneer's settlement offer, which was based on five claims for a total of $4,200.  If defendant chose not to settle, Pioneer indicated that it would conduct a more extensive review.  Again, several of the services Pioneer questioned, including provocative tests, visual fields and fundus photographs, are the very same procedures detailed in Statement of Offense.

On December 30, 2002, an Aetna fraud investigator requested copies of 10 patient files for specific dates of service to review.  Although defendant's employees routinely retrieved more than 10 patient files every evening before scheduled appointments, it took defendant six months to

13

produce the requested records. The evidence clearly suggests that he intentionally sought to delay

his production. First, he instructed his office manager to write Aetna, informing the insurance

company that the envelope he had been provided was too small to hold the requested patient files.

Once the mail issue was resolved, defendant instructed his office manager to write another letter to

Aetna, inquiring whether the originals or copies of the photographs in the patient files should be sent.

Even after these issues were resolved, defendant mailed just a few patient files at a time.

On September 10, 2003, after Aetna's medical reviewer determined defendant billed for

office visits at a higher level (i.e. "up coding"), Aetna requested 12 more patient files to review.

Again, defendant intentionally delayed sending these additional charts. According to a note he

wrote, his plan was to "send out two of the 12 little indians every 3 weeks, 6 times 3 is 18 weeks,

or 4 months, which is into Feb 2004." See Exhibit 7. He told his employees that his objective was:

> (1) To continue to do things slow (2) to find out what they are looking for (3) maybe
> to have them reassure us that this problem will be small to nothing. Remember, we
> sent out 10 of 10 charts in Spring of 2003, and 8 of the next 12 in the Fall of 2003.
> The last mailing was December 16. There are 4 'left.' They have 20 charts now.

Id. Defendant's wife also spoke with Aetna's investigator several times in an obvious effort to stall.

She told him that the production was slow due to lack of staff, death of the office manager's father,

a flooded office that damaged some of the charts, and dead patients' charts were kept off site in

storage. By February 2004, defendant still had not complied with Aetna's second request.

There is no doubt that defendant sought to delay the audit to give himself time to alter the

patients' files to justify his fraudulent billings. Records from the medical practice reveal that one

of his employees reviewed each of the patient files and the typed summaries. She prepared detailed

analyses of items that were missing or needed improvement. See, e.g., Exhibit 8. According to her

testimony before the grand jury, after she returned the patient files with her analyses to defendant, she never saw the files again.

After seizing the original Aetna files from defendant's office in February 2006, the government sought assistance from the Secret Service's document examination division. Gerald LaPorte performed a preliminary analysis on 19 pages of patient records. He concluded that five different black ballpoint inks were used to create a variety of entries. He identified the various pens by marking them in different colors. See Exhibit 9 (filed under seal). Since the writing inks are still widely available, Mr. LaPorte could not draw any conclusions as to when the entries were made. Yet, even to the untrained eye, it is obvious that on each page, defendant made entries with different pens even though most of the pages purportedly record information relating to a single date of service. A simple comparison of these audited patient files with other files that were not subject to audit from the same time period further demonstrates that defendant made these alterations. Despite the similarity of procedures, the amount of writing on the audited files is substantially greater than files reviewed by the government that were not subject to audit.

It appears from the evidence that defendant knew that the care he provided his patients would alarm his colleagues. In May 2004, a married couple who had seen defendant for many years informed him that they moved into a retirement community and could no longer travel to see him. They requested their medical records be sent to their new doctor. Rather then sending their complete medical records, defendant sent the most recent visits and prepared summaries of their appointments. Not surprisingly, defendant did not include in the wife's summary that between April 16, 1999 and March 7, 2002, he had purportedly performed 16 laser trabeculoplasties, 9 laser iridotomies and 15 laser iridoplasties.

**B.    The History and Characteristics of the Defendant**

Defendant's history and characteristics reflect a well educated man who has enjoyed all the benefits of a privileged lifestyle. As evident by the many letters written on defendant's behalf, he had numerous patients who adored him and valued his skill. While many doctors find it difficult to succeed as a sole practitioner, defendant's practice flourished. He had in excess of a 1,000 patients and maintained offices in at least two locations.[8] According to the patients and employees interviewed, defendant's offices were always busy. He regularly scheduled 10 to 15 patients per day. His and his wife earned substantial income.

In addition to his flourishing medical practice, defendant is also a published author and composer. With the exception of minor medical issues, defendant has enjoyed a healthy life.[9] Clearly, there is no excuse for his criminal conduct.

**C.    The Need for the Sentence to Reflect the Seriousness**
**of the Crime and Afford Adequate Deterrence**

This Court should also consider the need for the sentence to "reflect the seriousness of the offense," to "promote respect for the law," and to "provide just punishment," for the offense. Section 3553(2)(A).

---

[8]    To lure more patients into his practice, defendant falsely represented in his insurance provider applications that he maintained offices in additional locations. He provided telephone numbers for those "ghost" offices, which were linked to defendant's main office located in Fox Hall Square. Defendant instructed his employees to lie to individuals when they called to make an appointment. They told these callers various lies, including that new patients must be seen at the Fox Hall Office or there were no appointments available at those ghost locations on the days they were seeking to see defendant.

[9]    He is an avid tennis player. Indeed, his membership to Congressional County Club has enabled him and his children to improve their tennis skills.

Health Care Fraud: The rising cost of healthcare is one of our Nation's most serious problems. Health care fraud "increases the cost of healthcare for everyone." See Exhibit 10. As Barry Bargo of the Mail Handlers Benefit Plan explained: [t]he bottom line is the American public is deeply impacted by health care fraud, particularly by the fact that insurance premiums are raised, benefits are cut, and co-payments are increased to account for losses due to fraud. Id. Blue Cross Blue Shield Investigator Beth Reinhard noted that "[i]t is estimated that the cost of healthcare fraud is at lease three percent of the national healthcare costs or approximately $60 billion per year." Id. In addition to the economic loss to the insurance carriers caused by the payment of fraudulent claims, Ms. Reinhard explained that "[e]very consumer is affected by healthcare fraud" through "higher taxes to support federal healthcare programs and higher private health insurance premiums for consumers." Id. Her colleague, Charles Focarino, individualized the increased cost for each insured American when he explained that healthcare fraud costs $200 extra every year, resulting in a $800 increase annually for a family of four. Id.

The Guidelines focus almost exclusively on loss calculations in determining a sentencing range for health care fraud.[10]  As such, they fail to take into account the non-economic harm caused

---

[10]    The amount agreed to by the parties underestimates the amount of economic loss caused by defendant's fraudulent conduct. First, it does not include patient contribution for services that were never rendered or were unnecessary for their care.  In some cases, this amount was substantial.  For example, one of defendant's cataract surgery patients paid approximately $4,500 out of his own pocket. Many of the charges associated with this bill were for services defendant did not render, unnecessary diagnostic tests and office visits during the post-operative period. Second, the total loss amount used to calculate the Guidelines range does not include the additional charges submitted by the hospital center where defendant performed surgery.  Based upon defendant's operative notes, the hospital center unknowingly billed for services not rendered.  This would include the scleral grafts detailed in the Statement of Offense.  Every time defendant added this procedure to a routine cataract extraction, the surgery center billed an additional $1,200.  During the prosecution period, defendant billed for 108 scleral grafts that he did not perform.  As a result, the

by defendant's conduct that this Court should consider in fashioning an appropriate sentence.  To increase his revenue, defendant knowingly and intentionally provided poor healthcare.  He was a danger to his patients.  He unnecessarily exposed them to improper and unnecessary medical treatment that posed a threat to their health and safety.  He also deprived his patients of accurate medical records.  This is particularly disturbing, because serious ocular ailments are progressive and require careful monitoring of a condition to properly diagnose and determine the appropriate treatment.

Defendant's conduct also damaged the medical community.  Although Mr. Focarino noted that "[h]ealthcare fraud is committed by a very small number of people," it damages the reputation of all medical professionals and causes insurance companies, doctors and patients to distrust one another.  See Exhibit 10.  One of defendant's patients wrote in a letter to the Court that she has been unable to make myself go back to any eye doctor because she has lost her ability to trust.  Another patient wrote that he feels "duped" by defendant whom he "trusted with a most precious sense."  This patient was outraged that "a highly trained professional would resort to such seedy practices."

Health care fraud is particularly difficult to detect.  As evidenced by the patient letters written on defendant's behalf, many of these patients do not view themselves as victims.  As long as Medicare or their insurance carriers covered the costs, they do not worry about additional testing or procedures.  It is not unusual for patients, like doctors, to express hostility at the bureaucracy of

---

surgery center unknowingly billed an additional $129,600 for services that were not provided.  Third, the total loss amount does not include fraudulent billings before and after the time period specified in the Statement of Offense.  Although the government did not conduct an exhaustive review of defendant's billings before and after the prosecution period, it appears from some patients' comments that defendant's fraudulent billing scheme was not limited to this time period.

Medicare or other insurance carriers.  Even those patients who suspected defendant of fraud did not

complain to him or alert Medicare or the insurance companies of these irregularities.  Instead of

notifying Medicare or their insurance companies, patients simply chose to see another doctor.

Furthermore, the explanation of benefits that are regularly mailed to Medicare and insurance

recipients are often difficult to understand.  As one of defendant's patients explained:

> Although we received and reviewed regular statements from Medicare and Aetna, that
> detailed the charges that Dr. Greer made, we had no basis for questioning the number of
> procedures that he arranged or his charged for them.  Physicians identify procedures and the
> like by certain numeric codes, and a patient can verify that he/she saw the physician on the
> particular date, but beyond that is fairly much in the dark about what services were allegedly
> performed.

This is particularly difficult in the field of ophthalmology where a majority of  patients are elderly.

For the most part, patients are unable to see the procedures as they are being performed and many

of these procedures are complex.  It is not possible for a patient to verify whether the tests were

actually performed.  According to some of defendant's patients, defendant was not forthcoming in

his answers to their questions.   Some were so frustrated with his inability to communicate, and

accordingly sought new doctors.

Based on the evidence and argument as set forth above, a significant period of incarceration

should be imposed on this defendant commensurate with the severity of his crime.  His conduct was

not the result of mistake or negligence.  He knowingly and intentionally broke the law at the expense

of all patients who depend upon affordable and competent medical care.  His crimes threaten our

already tenuous health care system, and needs to be punished accordingly.

19

<u>Tax Fraud</u>: The United State's system of taxation is unique.  Unlike many countries, we permit our taxpayers to voluntary self assess and pay their income taxes.  The system, however, works only to the extent that taxpayers are honest, and have confidence that their neighbors are also honest in paying their fair share.  When everyone pays their fair share, we have the money we need to support our collective goals.  To ensure respect for this system, those who do not report and pay their fair share of taxes need to be prosecuted and punished.

Defendant's crime involved more than a failure to report income.  He employed several different schemes whereby he misrepresented his income and deductions to reduce both his corporate and personal income.  He also abused a not-for-profit organization.  In addition to the monies he donated, he solicited donations from others for the not-for-profit organization, knowing that the majority of the donations would fund his annual family vacation in the Cayman Islands.  In addition to depriving the U.S. Treasury of funds, the misuse of an exempt organization undermines the efforts of those who are truly dedicated to charitable work.

## V.    CONCLUSION

WHEREFORE, the government respectfully requests this Court to impose a 51 month period of incarceration and order defendant to pay restitution to Medicare, the private insurance companies, the U.S. Treasury and the D.C. government.

Respectfully submitted,

JEFFREY A. TAYLOR

UNITED STATES ATTORNEY

SUSAN B. MENZER

Assistant United States Attorney

District of Columbia

(202)514-6968

# GOVERNMENT EXHIBIT 6

✱

URGENT REMINDER

Kim Webber (Pioneer)
is coming tomorrow

⟶ All these charts
could be up for grabs,
Have you looked
over the list?

(Joy will come in
at 1:30 tomorrow
specifically for this ☺)

G 034090

# GOVERNMENT EXHIBIT 7

I had to terminate aetna becaue:
1. To begin the process of patient-izing prcatice

2. Because of the question about insurance

3. Because, of the 22 little indians, or the question, they could terminate me.

4. Because they are on the top of the list. Arriane alwwyas says so.

5. Because of what they did last december, dropping "return comprehensive to 50 dollars.

6. Because of their ugly past history which pops up again and again with words like fraud, conspiracy, etc. Even Hatala expressed disgust. Think Enron.

I will send out two of the 12 little indians every 3 weeks. 6 times 3 is 18 weeks, or 4 months, which is into Feb, 2004.

Here is the approach for Andy Dandy: January 28,2004

Objective: 1)To continue to do things slow 2)to find out what they are looking for 3)maybe to have them reassure us that this problem will be small to nothing. (Remember, we sent out 10 of 10 charts in Spring of 2003, and 8 of the next 12 in the Fall of 2003. The last mailing was December 16. There are 4 "left". They have 20 charts now.

Theme: Joy is out sick most of this month, we are really backed *say slow* up..., what is this about now?"

"Joy has been absent because of illness most of this month. Her desk is backed up, I will talk to her when she gets back next week.

.... but, oh, we got off a number of plans this year, including Aetna. And, anyway, you already have a whole stack of copied charts i believe. And I think Joy said of the few remaining charts some are old and archived and she cant find them. Don't you have enough by now??? What codes are you concerned about, anyway?"

and maybe  ... "now I remember - Aetna just settled a big suit in Miami that they had underpaid doctors for years, and Aetna also admitted they never gave doctors guidelines on how to code and bill, but would start to now, stuff like that. With all this admission of Aetna's failure, how do you go about reviewing charts that go back years?"

finally ...."I will talk to Joy when she gets back and keep working on the remaining charts she can find."

G 033893

# GOVERNMENT EXHIBIT 8

DOS  11/09/01

① initialized ALL pages with a date (same as DOS) including summary

② need report + interpretation for fundus photography (92250)

③ need report + interpretation for visual field (92082)

④ need better drawing for indirect ophthalmoscopy (92225)
   - need report + identification for indirect ophthalmoscopy

⑤ need better documentation with gonioscopy (92020)

⑥ ophthalmic biometry also require report + inter. notation (A-scan 76519)

⑦ OV code is E/M - needs -25 modifier (99205)
   face from American Academy of Ophthalmology E/M sheet

   audit form:  99205
   ―――――――――――
   E/M code

   we over bill 99205 because we never get
   should be a lower level because we never get
   complete history.

G 033607

# GOVERNMENT EXHIBIT 10



**BlueCross BlueShield
Association**

An Association of Independent
Blue Cross and Blue Shield Plans

Federal Employee Program
1310 G Street, N.W.
Washington, D.C. 20005
202.942.1000
Fax 202.942.1125

June 21, 2007

Susan Menzer
United States Attorney's Office for the District of Columbia
555 4th Street, N.W., Room 5834
Washington, D.C. 20001

**RE:    Douglas Greer, MD
        Cr. No. 07-095 (RJL)**

Dear Ms. Menzer:

Healthcare fraud is not a victimless crime that many consider it to be.  As such, we ask
that you take the following into consideration when you determine Dr. Greer's sentence,
as well as any future providers proven to have committed healthcare fraud.

Healthcare fraud is committed by a very small number of people.  Yet the impact is
costly and significant.  Because of healthcare fraud, every insured American pays about
$200 extra every year for health insurance. For a family of four, that's an extra $800
annually. For all Americans, fraud costs over $60 billion. And those loses were just in
2005.

It also results in damaged reputations for hospitals and medical professionals, and distrust
among insurance companies, doctors and patients.  Ours is a system built on trust, from
patient to doctor to hospital to insurance company.  Healthcare fraud erodes that trust,
making us think twice about diagnoses, treatments, billings and our overall healthcare
relationships.

The National Health Care Anti-Fraud Association (NHCAA) succinctly states the impact
of health care fraud.  The next section contains excerpts from their web site:

> **Fraud's Impact Goes Far Beyond Financial Loss**
>
> Health care fraud features the theft of very large amounts of money. However, the
> damage it does goes well beyond financial losses. More important is its inherent
> exploitation of individuals and their insurance information as the basis for falsified claims:
>
> - **Falsification of Patients' Diagnoses and/or Treatment Histories**
>   By its nature, one cannot commit health care fraud without falsifying something
>   about a patient's medical condition and/or treatment history. Thus, fraud
>   perpetrators routinely assign to the patients, whom they exploit, false diagnoses
>   of medical conditions they do not have, or of more severe conditions than they

RE: Douglas Greer, MD
Cr. No. 07-095 (RJL)

actually have.
Unless and until discovered (perhaps under adverse circumstances) those phony or "inflated" diagnoses become part of the patient's medical history, at least in the health insurer's records.

A Boston-area psychiatrist, for example, forfeited $1.3 million and was sentenced to several years in federal prison following his late-1990s conviction on 136 counts of mail fraud, money laundering and witness intimidation related to his fraudulent billing of several health insurers for psychiatric therapy sessions that never took place—using the names and insurance information of many people whom he actually had never met, let alone treated. (He also went so far as to write fictitious longhand session notes to ensure phony backup for his phony claims.)

In fabricating the claims, the psychiatrist also fabricated diagnoses for those "patients"—many of them adolescents. The phony conditions he assigned to them included "depressive psychosis," "suicidal ideation," "sexual identity problems" and "behavioral problems in school."

- **Theft of Patients' Finite Health Insurance Benefits**

  Privately insured patients typically have lifetime caps or other limits on benefits under their policies. Every time a false claim is paid in a given patient's name, the dollar amount counts toward that patient's lifetime or other limits.

  Part of the aforementioned psychiatrist's fraud involved routinely billing for the maximum number of therapy sessions covered by patients' health insurance, even if he had seen them only a handful of times—a fact that some patients discovered only when their claims for treatment by different psychiatrists were denied on the basis that they had already used all of their available benefits.

- **Physical Risk to Patients**

  Finally, the perpetrators of some types of fraud schemes (e.g., involving medical transportation, surgeries, invasive testing, certain drug therapies) deliberately and callously place their trusting patients at significant physical risk—illustrating vividly why federal law provides for longer potential prison terms in health care fraud cases that result in a patient's injury or death.

  In June, 2002, for example, a Chicago cardiologist was sentenced to 12-1/2 years in federal prison and was ordered to pay $16.5 million in fines and restitution after pleading guilty to performing 750 medically unnecessary heart catheterizations, along with unnecessary angioplasties and other tests as part of a 10-year fraud scheme.

  Three other physicians and a hospital administrator also pleaded guilty and received prison sentences for their part in the scheme, which resulted in the deaths of at least two patients.

  The physicians and hospital induced hundreds of homeless persons, substance abusers, and elderly men and women to feign symptoms and be admitted to the hospital for the unnecessary procedures. How? By offering them such incentives as food, cash and cigarettes.

  "There were 750 people who had needles stuck into their hearts purely for profit, not because they needed it," said one of the federal prosecutors.

2

RE: Douglas Greer, MD
Cr. No. 07-095 (RJL)

> At the bottom line, health care fraud is a serious crime that legitimately concerns all parties to our health care system—insurers and premium-payers, government and taxpayers, and patients and health care providers—and it is a costly reality that government and society cannot afford to overlook.

Thank you for your time and consideration. If you have any questions, please do not hesitate to contact me at (202) 942-1235 or charles.focarino@bcbsa.com.

Sincerely,

Charles W. Focarino
Director, FEP Special Investigations Unit

3

CareFirst BlueCross BlueShield
840 First Street NE
Washington, DC 20065
Tel. 202-479-8000

June 29, 2007



Judge Richard J. Leon
United States District Court
333 Constitution Ave
Washington, DC  20001


RE: Defendant:  Douglas F. Greer
        Sentencing Date:  July 26, 2007
        Number CR07-95-01



Dear Judge Leon:

The purpose of this letter is to provide a Victim Impact Statement from CareFirst
BlueCross BlueShield (CareFirst) regarding Douglas F. Greers' guilty plea of
having defrauded healthcare insurance companies.  Special Investigations at
CareFirst offers this supporting statement to give witness to you and the court of
the impact that Douglas F. Greer's healthcare fraud has had on CareFirst and the
healthcare community.  This is directly relevant to determining the appropriate
sentence to be imposed upon him for his deliberate and deceptive actions.

The Special Investigations Unit has been established at CareFirst to combat
healthcare fraud, waste and abuse since the 1980's.  It is estimated that the cost
of healthcare fraud is at least three percent of the national healthcare costs or
approximately $60 billion per year.  Complex reimbursement methodologies and
claim volumes are putting payers and providers at increasing risk of inappropriate
claims submissions and payment.  The healthcare fraud, waste and abuse
identification and recovery activities performed by the Special Investigation Unit
at CareFirst controls costs and ensures that no person or entity is unduly
enriched.

Every consumer is affected by healthcare fraud.  There are many kinds of fraud
and these acts add up to billions of dollars in lost healthcare dollars, higher taxes
to support federal healthcare programs and higher private health insurance
premiums for consumers.  Healthcare fraud also erodes public trust.  It has been
noted that Douglas F. Greer's fraudulent activities, directly impacted Carefirst to
a total loss amount of $149,517.00 as well as undetermined additional
administrative costs in workforce hours and effort to handle and investigate his
practices.  The impact of healthcare fraud, abuse and waste cannot be measured
in terms of dollars alone.  While healthcare fraud burdens our nation with
enormous financial costs, it also threatens the quality of healthcare.   Due to the

CareFirst BlueCross BlueShield is an independent licensee of the Blue Cross and Blue Shield Association.
® Registered trademark of the Blue Cross and Blue Shield Association ®' Registered trademark of Carefirst of Maryland, Inc.

fraudulent billing practices of Douglas F. Greer, our members were exposed to improper and unnecessary medical treatment that posed a threat to their health and safety.

CareFirst hopes the court will understand and make it clear to Douglas F. Greer that his actions of defrauding CareFirst is a serious and costly matter. Douglas F. Greer should receive the maximum penalty/sentence appropriate for this crime.

Sincerely,

Beth Reinhard, CFE
Special Investigations
Corporate Audit and Assurance Services



N A T I O N A L   A S S O C I A T I O N   O F   L E T T E R   C A R R I E R S

# HEALTH BENEFIT PLAN

20547 Waverly Court, Ashburn, Virginia 20149 • (703) 729-4677 or 1-888-636-NALC (6252)
**William H. Young,** President • **Timothy C. O'Malley,** Director



July 2, 2007


Honorable Richard J. Leon
United States District Court
for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:  Dr. Douglas Greer


Dear Judge Leon,

Please be advised that the National Association of Letter Carriers Health Benefit Plan
(the Plan) is a Federal Employees Health Benefit Plan established through contract with
the U.S. Office of Personnel Management. The Plan insures active and retired federal and
postal workers throughout the world.

Our restitution is $428.00. The Plan is required by our contract with the U.S. Office of
Personnel Management to collect all overpayments in full. Fraud increases the cost of
health care for everyone and increases the Federal Employees Health Benefit Program
premiums. We appreciate your assistance in helping us meet the federal requirement to
recoup this overpayment and fighting health care fraud.


Sincerely,

Calvin I. Engel
Administrator


CIE:klm

Board of Trustees
Randall L. Keller          Lawrence D. Brown, Jr., Ch.          Michael J. Gill




NATIONAL  ASSOCIATION  OF  LETTER  CARRIERS

# HEALTH  BENEFIT  PLAN

20547 Waverly Court, Ashburn, Virginia 20149 • (703) 729-4677 or 1-888-636-NALC (6252)
**William H. Young**, President  •  **Timothy C. O'Malley**, Director

July 2, 2007

Susan Menzer
United States Attorney's Office for the District of Columbia
555 4th Street, N.W.
Room 5834
Washington, DC  20001

Re: Dr. Douglas Greer

Dear Ms. Menzer,

Please find attached correspondence addressed to the Honorable Richard J. Leon regarding the restitution due the National Association of Letter Carriers Health Benefit Plan, pursuant to your request.

Please let me know if you have any questions or need additional information.

Sincerely,

Karen L. Moore
Supervisor Legal/SIU

Board of Trustees
Randall L. Keller      Lawrence D. Brown, Jr., Ch.      Michael J. Gill

# The Mail Handlers
# Benefit Plan



**P.O. Box 1910**
**Rockville, MD 20849-1910**
**(301) 738-1216**

June 18, 2007

U.S. Attorney's Office for DC
Attn: AUSA Susan Menzer
555 4th St NW, Rm 5834
Washington, DC 20001

Dear AUSA Menzer:

Enclosed is a letter to the Honorable Richard J. Leon that you requested for the upcoming sentencing of Douglas F. Greer. Please let me know if you need if you have any questions and need additional information.

Sincerely,

Barry Bargo
MHBP SIU Manager
(301) 517-2193
BLBargo@cvty.com

# The Mail Handlers Benefit Plan



**P.O. Box 1910**
**Rockville, MD 20849-1910**
**(301) 738-1216**

June 18, 2007

Dear Honorable Richard J. Leon:

I am writing to you on behalf of the Mail Handlers Benefit Plan (the Plan) regarding the upcoming sentencing of Douglas F, Greer. This individual pleaded guilty to one count of health care fraud (18 U.S.C. Section 1347) and one count of filing a false tax return (26 U.S.C. Section 7206(1)) on May 3, 2007. In support of the case presented by the United States Attorney's Office of the District of Columbia against Douglas F. Greer, I would like to present the following information as it relates to this case, in particular to the count of health care fraud, and the impact to the Mail Handlers Benefit Plan and its policy holders.

Health care fraud is a serious problem that continues to affect the health care industry in the United States. A recent estimate states that 3 percent, or $51 billion, per year is lost to health care fraud. Some estimates place this loss as high as 10 percent, or $170 billion, per year. The bottom line is the American public is deeply impacted by health care fraud, particularly by the fact that insurance premiums are raised, benefits are cut, and co-payments are increased to account for losses due to fraud.

The health care fraud that was committed by Douglas F. Greer included claims submitted to the Mail Handlers Benefit Plan on behalf of patients that are policy holders of the Plan and/or their dependents. The fraudulent claims submitted by Douglas F. Greer not only impact the Plan financially, but also impact the patients and policy holders in several ways. According to the case presented by the U.S. Attorney's Office, Douglas F. Greer submitted claims to the Plan for ocular tests that were not necessary for the patients' condition. Thus, the patients were subjected to have tests performed on them that they did not need. He also billed for surgical procedures that were not necessary or that were billed at a higher level than performed. Although not applicable to this Plan, this type of billing could have an impact on the patient's insurance in the fact that benefits paid for these fraudulent services may count towards lifetime policy maximums. In addition, the performance of unnecessary procedures or the increased levels of procedures are documented in the patients' medical files, thus falsifying the services that the patient actually received and potentially compromising the record of their true medical condition.

I am requesting that the impact of the fraud committed by Douglas F. Greer against the Mail Handlers Benefit Plan and its policy holders as indicated above is taken into consideration when determining the sentencing of this individual.

Sincerely,

*Barry Bargo*

Barry Bargo
Special Investigations Unit Manager
Mail Handlers Benefit Plan