**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Criminal No. 07-095 (RJL)** |
| | ) | |
| DOUGLAS F. GREER, M.D., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR LEAVE TO FILE**
**REPLY BRIEF AND SUPPLEMENTAL SENTENCING MEMORANDUM**

Defendant Douglas F. Greer, M.D., by counsel, respectfully requests leave to file a reply brief and supplemental memorandum in further support of his July 19, 2007 Sentencing Memorandum. We submit the attached memorandum and exhibits to supplement our original memorandum with additional letters of support and documents received since the filing of the original brief. In addition, Dr. Greer seeks leave to file the reply brief in order to address significant errors and issues in the government's Memorandum in Aid of Sentencing.

Respectfully submitted,

_____/s/ John N. Nassikas III_____
John N. Nassikas III, Bar No. 387167
ARENT FOX LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 857-6000
Facsimile: (202) 857-6395
nassikas.john@arentfox.com

Counsel for Defendant Douglas Greer, M.D.

Dated: July 25, 2007

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on July 25, 2007, he caused a true and correct copy of the

foregoing Motion for Leave to File Reply Brief and Supplemental Sentencing Memorandum to

be filed electronically with the Court.  Notice of this filing will be sent by operation of the

Court's electronic filing system to all ECF registered parties and via Federal Express to Kelli

Griffin Cave.  Parties may access this filing through the Court's CM/ECF system.

<u>By Electronic Filing</u>

> Susan Menzer, Esq.
> Assistant United States Attorney
> United States Attorney's Office
>  for the District of Columbia
> 555 Fourth Street, N.W.
> Washington, D.C. 20530

<u>By E-Mail</u>

> Kelli Griffin Cave
> United States Probation Officer
> 333 Constitution Avenue, N.W.
> Suite 2800
> Washington, D.C. 20001

> _____    /s/ John N. Nassikas III_____

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 07-095 (RJL)** |
| | ) | |
| **DOUGLAS F. GREER, M.D.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**ORDER**</u>

Pending before this Court is Defendant Douglas F. Greer's Motion to File Reply Brief and Supplemental Sentencing Memorandum.

It is hereby **ORDERED**, this ___ day of July 2007, that the Defendant's Motion to File Reply Brief and Supplemental Sentencing Memorandum is **GRANTED.**


_____
The Honorable Richard J. Leon

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. CR-07-095-01 (RJL) |
| | ) | |
| DOUGLAS F. GREER, M.D. | ) | |
| | ) | |

## DEFENDANT'S REPLY BRIEF AND SUPPLEMENTAL SENTENCING MEMORANDUM

Defendant Douglas F. Greer, M.D., by counsel, respectfully requests that the Court consider this reply brief, addressing serious prosecutorial overreaching and overstating, and supplemental sentencing memorandum, providing recently received letters of support and the recently signed civil settlement agreement.

Despite the government's attempt in its sentencing papers through hyperbole and ad hominem attacks to smear Dr. Greer as a person and as a doctor, the plea agreement and Dr. Greer's plea proceedings before this Court make clear that Dr. Greer pled guilty to committing billing fraud against Medicare and insurance companies, not to being a bad doctor to his patients. After two and a half years of investigation, involving continuous oral and written communication and cooperation by defense counsel, the U.S. Attorney's office well knows that the defense has vigorously contested many of the government's allegations and agreed only to the charges related to improper billing. The government rightly chose not to indict Dr. Greer on harm-to-patient theories; that case would have gone to trial and the defense vigorously, and we strongly believe successfully, would have challenged such theories. Unfortunately, the government now seems wrongly and unnecessarily to be trying to attack Dr. Greer, through the back door of sentencing, on allegations they could not get through the front door of a plea.

The Supreme Court has defined a prosecutor's obligation not as winning a case but ensuring that justice be done. In fulfilling this obligation, the Court said that

> while [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935). In its effort to put irrelevant, inflammatory, and unproven facts before this Court, the government has strayed from its Plea Agreement with Dr. Greer and the Court's guidance at the plea hearing on May 3 regarding certain disputed facts. The focus of the government's memorandum is not the billing conduct for which Dr. Greer pled guilty but instead the unproven disputed allegations that Dr. Greer provided inadequate or harmful patient care. As the more than one hundred patient letters and many of the victim impact statements submitted by the government attest, nothing could be further from the truth.[1]

## I.    THE GOVERNMENT IMPROPERLY ARGUES THE SENTENCING FACTORS BASED ON DISPUTED ALLEGATIONS REGARDING THE MEDICAL NECESSITY OF TESTS AND PROCEDURES AND THE ALTERATION OF RECORDS

The government irrelevantly devotes most of its sentencing memorandum and exhibits to making one-sided rebuttable allegations that Dr. Greer performed medically unnecessary procedures[2] and attempted to interfere with insurance audits, in essence, ignoring the Court's

---

[1] Since submitting the Sentencing Memorandum on July 19, counsel has received an additional nine letters and emails from patients and colleagues. It is our understanding that several of the letters were sent directly to the Court but, to ensure the record is complete, we have attached all of the correspondence to this Reply for the Court's consideration. *See* Correspondence from S. Klein, G. Lieber, J. Santos, W. Sollers, G. Teicher, W. Whipple and Col. Warren Whipple, G. Willingham, D. Belyea, M.D., and J. Coleman, M.D., Exs. 1, 2, 3, 4, 5, 6, 7, 8 & 9, respectively. We have also included the civil Settlement Agreement that was executed since Dr. Greer's Sentencing Memorandum was filed with this Court. *See* Settlement Agreement, Ex. 10.

[2] Dr. Greer's disagreement with the government's definition of "medically unnecessary" stems from the notion that "medical necessity" is a question of fact, and services deemed medically unnecessary under insurance regulations are not inevitably contrary to professional medical standards. *See United States v. Prabhu*, 442 F. Supp. 2d 1008, 1032 (D. Nev. 2006) (differentiating between clinical determination of medically necessary procedures and Medicare determination); *Krodel v. Bayer Corp.*, 400 F. Supp. 2d 345 (holding that interpretation of "medical necessity" in insurance plan improperly conflicted with medical expert opinions); *United States v. Vest*, 116 F.3d

direction at the May 3 plea hearing.[3]  In noting that Dr. Greer disputed certain portions of the

government's Criminal Information and denying the government's request for additional time at

the sentencing hearing to present evidence of these allegations, the Court stated:

> You have a dispute.  The parties have a dispute as to… what
> appears to me to be a very limited amount of facts in this case.
> Certainly, if you just put those aside for a moment, based on a
> quick review of the statement of the offense, there is more than
> enough evidence, which has been acknowledged by the
> defendant to make out the case as to each essential element.  I don't
> see any necessity at all for the Court to reach any ruling as to the
> facts that are in dispute.  I don't intend to unless I have to.  I don't
> see any reason legally why I would have to.  So as of right now, I
> wouldn't expect to spend a minute on any disputes in the facts in
> this case, unless you can show me a reason why I need to.

Plea Hearing Tr., p. 35 (May 3, 2007), Ex. 11.

Without rebutting each of the government's erroneous factual assertions that go beyond

the Plea Agreement, we feel compelled to discuss the one assertion for which we were able to

determine the patient's identity and review that patient's chart in order to highlight how

unreliable the government's characterization of disputed facts is.  On pages 9 and 10 of its brief,

the government describes Dr. Greer's care of a patient with closed angle glaucoma, also called

narrow angle or angle-closure glaucoma, using numerous laser treatments, Dr. Greer's billing of

his services, and its expert's examination of the patient.  The government's conclusory allegation

regarding this patient's care is an expert found no closed angle glaucoma, from which the

---

1179, 1184 (7th Cir. 1997) (upholding mail fraud conviction where government properly proved defendant's
fraudulent intent through expert medical testimony about necessity of testing).
[3] At the plea hearing, counsel specifically noted that, while Dr. Greer agreed that certain services he billed to
insurers were medically unnecessary for insurance purposes, he specifically did not admit to performing tests and
procedures that were medically wrong.  *See* Plea Hearing Tr., p. 21 (May 3, 2007), Ex. 11.  The government,
however, rests most of its sentencing position on bald assertions that Dr. Greer performed unnecessary medical
procedures on patients, without providing more than its own words in support.  For example, the government refers
to an unnamed Aetna patient allegedly diagnosed with and treated for pterygium.  Government Br., at 10.  Without
knowing the names of the patient or any further details about the examination conducted by the government's
expert, it would be impossible for Dr. Greer to rebut the government's allegations that unnecessary procedures were
performed nor can he question the methods of the government expert's examination.  Moreover, the government has
not attached an expert report or any documentation of these patients' examinations.

government wrongly concludes that Dr. Greer simply made up the glaucoma diagnosis and performed and billed for numerous procedures that he knew to be unnecessary. Nothing could be further from the truth.

The patient in question, who wrote a letter to the Court on Dr. Greer's behalf, did have closed angle glaucoma, and in fact, came to Dr. Greer already having abnormal visual field results from Dr. Mansour Armaly, a late glaucoma specialist, and the Prevention of Blindness Society. After confirming what the patient said, that she had glaucoma, Dr. Greer diagnosed her with closed angle glaucoma (also known as angle-closure glaucoma) and cataracts and performed numerous different types of laser procedures on the patient in order to address her eye issues. After Dr. Greer removed the patient's cataracts, her angles opened, and he noted this in her chart. (The attached journal article abstracts from the National Library of Medicine and National Institutes of Health website confirm that width and depth of the anterior chamber angle in narrow angle glaucoma patients can increase significantly after cataract surgery.)[4] Not surprisingly, several years later, the government expert noted the same thing.[5] In other words, Dr. Greer successfully treated the problem. In fact, the surgery was so successful that Dr. Greer deemed the patient as merely glaucoma suspect after the surgery. With regard to the government's insinuation that the numerous laser procedures were harmful to, or at a minimum, uncomfortable for the patient, the government well knows that there are ophthalmic experts, such

---

[4] *See* J.S. Lai et al., *The Clinical Outcomes of Cataract Extraction by Phacoemulsification in Eyes with Primary Angle-Closure Glaucoma (PACG) and Co-Existing Cataract: A Prospective Case Series*, J. GLAUCOMA, Aug. 2006; K. Hayashi et al., *Changes in Anterior Chamber Angle Width and Depth After Intraocular Lens Implantation in Eyes with Glaucoma*, OPHTHALMOLOGY, March 2001; J. Dawczynski et al., *Anterior Segment Optical Coherence Tomography for Evaluation of Changes in Anterior Chamber Angle and Depth After Intraocular Lens Implantation in Eyes with Glaucoma*, EUR. J. OPHTHALMOLOGY, May-June 2007, Exs. 16, 17 & 18, respectively (*all available at* www.ncbi.nlm.nih.gov).

[5] It is our understanding that the government's expert specializes in pediatric ophthalmology. Narrow angle glaucoma rarely, if ever, occurs the pediatric population. Without knowing more about the expert's credentials and experience, it is impossible to determine whether he has ever removed cataracts from a patient with narrow angle glaucoma.

as Linsy Farris, M.D. whose letter is attached to the Letter to S. Menzer from J. Nassikas, dated

Dec. 23, 2005, Ex. 12, *infra*, confirming the validity of Dr. Greer's cautious incremental laser

approach, particularly when used as Dr. Greer did, to lessen the pain and discomfort of

procedures.

      With the above exception, Dr. Greer has not addressed, either in his Sentencing

Memorandum or this Reply, any of the government's assertions beyond the scope of the plea

because, as the Court noted at the plea hearing, he pled guilty to billing Medicare and private

insurers for what they deemed to be medically unnecessary procedures; therefore, the unproven,

and hotly disputed, government allegations are irrelevant to the Court's sentencing decision.  For

the Court's convenience, counsel attaches relevant defense correspondence with the government

that extensively addressed and rejected many of the government's theories and allegations. *See*

Letters to S. Menzer from J. Nassikas, dated Dec. 23, 2005, Apr. 21, 2006, and July 28, 2006,

Exs. 12, 13, and 14, respectively.  In continuing to argue disputed facts regarding Dr. Greer's

patient care and audit conduct, some of which occurred years before or after the time period with

which the government chose to charge Dr. Greer, the government improperly is attempting to

make Dr. Greer's sentencing a trial on the merits – an outcome specifically obviated by Dr.

Greer's guilty plea.

      Dr. Greer pled guilty to billing fraud and accepts full responsibility for the actions set

forth in the statement of the offense.  This does not mean, however, that there were no defenses

to the wrongful billing allegations.  There were many, as described in the letters to the

government cited above and as set forth in communications with the government over the past

two years, but Dr. Greer chose to end his career and this difficult process in part to protect his

wife and two children.  Before the parties reached agreement on the plea, the government had put

the Greers' daughter in the grand jury and scheduled several times to have their son appear

before the grand jury to try to bolster their secondary tax charges. As the forensic evaluation by

Dr. Neil Blumberg, filed under seal, and the revised Pre-Sentence Report relating to personal and

family characteristics would suggest, the pain of this process understandably became too great,

and this plea to the facts to which he could agree and for which he accepts full responsibility, and

related civil agreement, ensued in order to achieve final "global" resolution.

## II.     THE GOVERNMENT'S VICTIM IMPACT PACKET MISLED PATIENTS

By its own admission, the government sent out over 1,000 victim impact statement

packets to Dr. Greer's patients and clearly, based on a review of the responses received, spoke by

telephone with a number of them. *See* Government Brief at 9, n. 3. Putting aside the propriety

of sending these impact statements to patients as distinguished from insurance companies and

Medicare – which were the only victims designated by the government in the Statement of

Offense – the government fails to note in its submission to the Court that the victim impact

packet, which is attached in blank form to this Reply, was sent to patients who did not receive

care from Dr. Greer during the time period covered by the Plea Agreement.[6] *See* Government

Victim Impact Packet, Ex. 15. Moreover, the majority of victim impact packets were sent to

patients for whom the government has no information or expert opinion regarding Dr. Greer's

care because the government never requested their records from Dr. Greer. In other words,

without a review of the charts, the government has no way of knowing whether Dr. Greer's care

of the patients was appropriate and billed as such and therefore has no basis on which to

characterize those patients – to the patients themselves or to this Court – as victims.

---

[6] Dr. Greer and counsel have received phone calls from patients who received care well outside the relevant time frame, including as recently as 2006, advising that they had received victim impact forms from the government. In fact, several of the patients who submitted victim impact statements that the government attached to its memorandum say that they either saw Dr. Greer solely before 1999 or began seeing him well after 2002.

Most disturbingly, though, the government asked patients, many of them elderly, to explain how it feels to be a victim of a violent crime and to describe their feelings of paranoia, helplessness, and vulnerability.  While several of the patients noted that health care and tax fraud are not violent crimes, others apparently took the question at face value, accepting the government's assertion that they were, in fact, victims of a violent crime, and answered it.  In its footnote 3, the government claims that the U.S. Attorney's Office uses the form – which includes questions aimed at eliciting responses from victims of violent crimes – for all cases.  *See* Government Brief at 9, n. 3.  The failure to have a form that properly characterizes the conduct at issue is no excuse for the government's prejudicial mailing of a form reflecting violent crimes in this case and raises a separate issue, beyond the scope of this sentencing, of the propriety of the admitted universal use of this form by the U.S. Attorney's Office in all crime cases, whether violent or non-violent.  Moreover, if the government's claim is true that the U.S. Attorney's Office has only the victim impact form sent in this case, the government, before sending the packets, easily could have at least crossed out the reference to violent crime, just as one patient did.  Government Br., Ex. 1.   By failing to do so, the government needlessly frightened Dr. Greer's patients into thinking they were the victims of a violent crime and evoked in them previously nonexistent feelings of despair and paranoia.  By deliberately using a form that refers wrongly, *inter alia*, to "fear of going out in a world that has been proven unsafe," to "defense attorney's insinuations," and to "What is your recommendation for sentencing? (mandatory/maximum)," the government has improperly tried to poison the opinions of people who clearly are not "victims of violent crime" in the first place.  Given the improper and inflammatory nature of the victim impact packet sent to the patients, we also are  concerned

about the nature of the comments made or directions given by the government in its telephone conversations with the patients.

Finally, the packet that the government sent included a cover letter that misled Dr. Greer's patients into thinking that he admitted to altering medical charts and scheduling office visits more frequently than medically necessary, something that many of the negative victim impact statements reference. In the cover letter, the government states that Dr. Greer pled guilty to "a criminal information," which it enclosed in the packet – without mentioning that certain allegations are disputed. And, in the following sentence, the government says only that the enclosed Statement of Offense "describes the offenses Dr. Greer admitted committing," again without stating that Dr. Greer specifically did not admit to the inflammatory allegations in the Criminal Information (a document, the Court may recall, that the government did not show to counsel, despite counsel's specific request, before filing). *See* Government Victim Impact Packet, Ex. 15. As shown by the responses that the government received, patients understandably did not realize that the Statement of Offense does not contain reference to the alteration of records or the frequency of scheduled office visits. Instead, they read the entire packet, including the allegations contained in the Criminal Information, and likely concluded that Dr. Greer admitted to everything that the government sent.

In sending victim impact packets to patients that the government itself cannot be sure are victims, the government has caused untold confusion, anxiety, and fear in patients – in effect, victimizing patients who were not necessarily victims and who definitely were not victims of a violent crime. And the actual damage of the government's improper actions could be far greater if "more than 1,000 letters" really means that 1,500 or 2,000 letters or more were sent. *See* Government Br., at 9 n. 3.

8

## IV.     CONCLUSION

In light of the government's inclusion of irrelevant, unsupported, and rebuttable allegations in its sentencing memorandum and its fallacious victim impact packet, which needlessly frightened and confused many of Dr. Greer's patients, we request that the Court give little weight to the government's sentencing position and no weight favorable to the government to the negative patient victim impact statements in its determination of Dr. Greer's sentence.  In making that determination, Dr. Greer once again asks the Court to consider the four decades of his dedication to the practice of medicine and to the health and welfare of his patients, and to exercise its discretion and sentence him leniently in accordance with the applicable sentencing factors.

Respectfully submitted,

/s/ John N. Nassikas III_____
John N. Nassikas III, Bar No. 387167
ARENT FOX LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:  (202) 857-6000
Facsimile:  (202) 857-6395
nassikas.john@arentfox.com

Counsel for Defendant Douglas Greer, M.D.

Dated:  July 25, 2007

*Stephen Klein*
*10801 Alloway Drive*
*Potomac, MD  20854*

July 24, 2007

The Honorable Richard J. Leon
United States District Court
For the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:  United States v. Douglas F. Greer
     Case No. 1:07-cr-00095-RJL

Dear Judge Leon:

I am the president of a company which has been operating since 1978 in Prince Georges County, Maryland.  We have a diverse work force that is drawn from PG County, the District of Columbia and other surrounding areas.   Having been in business for nearly 30 years, we have worked with organizations, churches and associations in this area, having supported charitable and other initiatives.

I would be willing to work with Dr. Greer to try to establish an eye clinic that would be able to serve people in this community, and would like the opportunity to attempt to accomplish this over the next 150 days.  I would make the following efforts in this period of time:

1. Contact the organizations, churches and other associations we know to find out if they would be willing to act to "get the message out" to their constituents, if such a clinic were available.
2. Contact our landlord to find appropriate space for the clinic.
3. Work with Dr. Greer to establish the necessary administrative, clerical and other resources which would be required to support the operation of the clinic.
4. Work with Dr. Greer to establish a pool of opthalmologists who would volunteer their time to the clinic so that it is regularly staffed.
5. Work with Dr. Greer to arrange for the donation and installation of his office equipment for the functioning of the clinic.
6. Work with legal and other professionals to establish the proper entity to enable the operation of the clinic.
7. Report back to the Court at the end of this period, if you so desire, to confirm the status of our efforts.

The Honorable Richard J. Leon
July 24, 2007
Page Two

I am aware that all of this will take initial funding as well as ongoing monetary support, and there is no way at this time to predict success.   However, I am hopeful that among individuals, companies in this area and other sources, we will be able to make a strong effort to establish and put the clinic on solid ground.   I would welcome having the opportunity to make a success of this project.

I am hopeful that the benefits of having such a clinic will be apparent to those who I would contact, and that there would be enthusiastic support for it. I know that the people who work at my company themselves will be enthusiastic spokespersons for such a clinic.

I am hoping that you will allow Dr. Greer the time and ability to contribute to this effort, which obviously will provide Dr. Greer with the opportunity to continue to contribute constructively. Thank you for your consideration.

Very truly yours,

Stephen Klein



Gary L. Lieber

Phone: (202) 342-3410

Fax: (202) 295-6766

GLieber@saul.com

www.saul.com

July 23, 2007

The Honorable Richard J. Leon
United States District Judge
United States District Court
   for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

     Re:    *U.S. v. Douglas F. Greer*
            Case No. 1:07-CV-00095-RJL

Dear Judge Leon:

     I am a member of the Bars of the District of Columbia and Pennsylvania and a member of this Court. I have been practicing labor and employment law for nearly thirty years, the last twenty-seven years in private practice in the District of Columbia. I write today as a patient of Dr. Douglas Greer who I understand has pled guilty and is awaiting sentencing.

     I believe I have been a patient of Dr. Greer's for at least ten years. I have Type II diabetes and, therefore, must see an ophthalmologist on a regular basis. Throughout my years as a patient, Dr. Greer's medical care and treatment has been first rate. I see several doctors on a regular basis and I can say without qualification that Dr. Greer's care has been second to none. There was at one time some concern over my score on a peripheral vision test. Dr. Greer correctly analyzed the issue and, solely to eliminate any possibility of brain impairment, he properly referred me to a specialist. On other occasions, he has gone out of his way to explain his diagnosis to me and spend that extra amount of time necessary to explain his medical findings and treatment.

     I would also like to say something about his billing practice since it is this subject for which he has apparently been indicted. I found his billing practices to be typical of a medical doctor exercising the proper standards. I review these bills carefully and, in my opinion, there was no over-billing of either the patient or the insurance company.

     I do not know the underlying factual basis for the action against Dr. Greer. However, like you, I have assessed the credibility of witnesses for many years and I can tell an honest

2600 Virginia Avenue, N.W. ♦ Suite 1000 – The Watergate ♦ Washington, D.C. 20037-1922
Phone: (202) 333-8800 ♦ Fax: (202) 337-6065

BALTIMORE   CHESTERBROOK   HARRISBURG   NEWARK   PHILADELPHIA   PRINCETON   WASHINGTON   WILMINGTON

A DELAWARE LIMITED LIABILITY PARTNERSHIP

person from a dishonest person or a person attempting to steal around the edges. Based on my direct observations, I cannot under <u>any</u> circumstances believe that Dr. Greer intentionally sought to defraud anyone. He was completely devoted to his patients and any type of improper conduct was completely inconsistent with the way he conducted himself.

Dr. Greer is a fine and decent man. He has already suffered tremendously by this action. For the reasons set forth above, I urge you to take into account his decency and his devotion to his patients and this community in your sentencing.

Thank you for allowing me to provide this information.

Very truly yours,

Gary L. Lieber

GLL/cim

934754 1

4512 Lowell St., NW
Washington, DC 20016
Phone: 971-255-0347

July 19, 2007

The Honorable Richard J. Leon
United States District Court for the
        District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

        RE:  United States v. Douglas F. Greer
             Case No. 1:07-cr-00095-RJL

Dear Judge Leon:

As a patient of Dr Greer for the last several years, I was sent information on
the above case by the US Attorney's Office.  Although I was a patient of Dr.
Greer, I don't consider myself a victim in this case as I never experienced
any harm from Dr Greer.  In fact, most of my involvement with him was for
annual eye exams.  However, I did get to know him on a somewhat social
basis as he and his wife shared with me concerns about school placement for
their son; and later (in 2004) found that we both had sons enrolling as
freshmen at Villanova University.  In these meetings, I found both Dr. Greer
and his wife particularly concerned and involved parents.

Needless to say, I was deeply saddened by the news of Dr. Greer's legal
difficulty.  I am writing to the court to share my thoughts about his
upcoming sentencing, both as a patient and as someone with over twenty-
five years of work in the field of criminal justice, most recently at the US
Department of Justice.

Although I am aware of the sentencing guidelines regarding Dr. Greer's
offense, I believe that he has already received the most painful part of his
punishment:  public humiliation, relinquishing his license to practice
medicine, and losing his means of livelihood.  Not only is this the most
significant consequence for Dr. Greer, but it sends a message to all doctors
and, therefore, accomplishes the deterrent effect implicit in any sentence.

I hope the court will consider the good that Dr. Greer can do for society in fashioning his sentence. Although he cannot practice medicine, he has knowledge and skills that can be used to benefit others. A sentence that includes a well-structured program of community service would seem to be a productive way for Dr. Greer to give back to society.  There are so many needs that Dr. Greer can meet and at the same time satisfy his debt to society.  Incarceration would waste this opportunity.

Please know that I have given a great deal of thought to this, not only in conjunction with this case but throughout my career in criminal justice. There would be no benefit to anyone in imposing a prison sentence in this case.  Clearly, incarceration would be a terribly burden on his family, especially his young adult children.

I am hopeful that you will accept the sincerity of my views expressed in this letter.


Sincerely,



Jeannie N. Santos

# KING & SPALDING LLP

King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006-4706
www.kslaw.com

Wick Sollers
Counsel
Direct Dial: (202) 626-2937
Direct Fax: (202) 626-3737
BTalmadge@KSLAW.com

July 18, 2007

Honorable Judge Richard J. Leon
United States District Court
for the District of Columbia
33 Constitution Avenue, NW
Washington, DC 20001

      Re:    <u>**United States v. Douglas Greer**</u>
            **Cr. 07-95 (RJL)**

## <u>HAND DELIVERY</u>

Dear Judge Leon:

      I write to request, most respectfully, your consideration of an alternative sentence, other than incarceration, for Dr. Douglas Greer, a friend and former neighbor. I have known Doug and his family for the past ten years and could never have imagined that they would have found themselves in such a devastating position versus the government.

      Doug and his family are good people and extremely well regarded in the community. I am not intimately familiar with the facts of this matter but can certainly imagine that poor record keeping and naivety about the pitfalls of billing government programs could be the source of the issues in this case. I do know that nothing from my personal experience and interactions with Doug Greer and his family is consistent with someone who intended to commit fraud against the United States.

      While my experience with the sentencing guidelines is far less than yours, I have found them to be particularly ill-suited for healthcare fraud cases and cases involving professionals such as Doug Greer. The government often calculates damages in a manner that exaggerates even their most aggressive theory of the case and affords no allowance for defenses and actual benefit conferred to patients. The government, in a plea situation such as this one, is able to substitute its narrow view of the appropriateness of medical procedures for doctors' independent medical judgment and often complex medical necessity decisions. Their damage theories can ignore completely the practical realities of practicing medicine and the billing morass that small doctor offices must navigate to be compensated by the government, often recovering only cents on the dollar on procedures legitimately and necessarily performed.

ATLANTA • HOUSTON • LONDON • NEW YORK • WASHINGTON, D.C.

Honorable Judge Richard J. Leon
July 18, 2007
Page 2

    Judge Leon, I realize many defendants come before you and that each one has a story. I also know that you are a very wise and compassionate judge, and I would implore you to consider whether there is an alternate sentence for Doug Greer that would allow him to serve the public, while still satisfying the interests of justice. The amount of pain and suffering that already has been inflicted upon him and his family is unimaginable, at least to me. I fervently hope that you will find a way to allow Doug and the Greer family to move beyond this tragedy and remain positive forces in the community.

    I greatly appreciate your consideration of this letter.

Sincerely,

J. Sedwick Sollers, III
Managing Partner

Cc:    John Nassikas

The Honorable Richard J. Leon
United States District Court
for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:     United States v. Douglas F. Greer
        Case No. 1:07-cr-00095-RJL

Dear Judge Leon:

I am writing a letter on behalf of Dr. Douglas Greer who has pled guilty in the above
mentioned case and is awaiting sentencing. We have known Doug and his wife and
children for more than 15 years. He is an active, engaged parent whom we came to know
through our son's soccer team. He was always actively involved with his kids, his wife
and his community and well liked and respected.

Dr. Greer has been our family ophthalmologist for many years. During that time, he was
always extremely attentive, personal, personable and conscientious. In many ways he
was the embodiment of the old fashioned family doctor. Annette, his wife, worked in the
office with him and the practice had the feel of a sort of mom and pop shop. As a doctor,
he was caring and conservative.

Dr. Greer is a doctor who made time for and took time with each of us as patients. He
was never rushed, as many doctors are, and was someone in whom we felt confident. In
my family's opinion – it is better to have a doctor who puts his attention into caring for
his patients – which he always has done. If he made errors in book keeping, I believe
they were unintentional, more indicative, as I said before, of an old fashioned kind of
doctor who never was inattentive to his patient's health – a quality very rare in today's
business-driven, insurance driven, regulation driven health care industry.

Please consider this as you decide Doug's sentence and fate: Any mistakes he made have
already sentenced him to a life from now on that he never would have chosen for himself
or his family. It is tragic that Doug Greer – in an unimaginable, horrible situation –
particularly at his age – losing everything he spent a lifetime building, including his
health and his wife's health – the humiliation – the pain – and the prospect of being at
this stage of life without any assets or a way to make a living as a doctor – the profession
he loved and really dedicated himself to. Please see that his suffering will not abate,
regardless of his sentence – he is sentenced to live the rest of his life without his essential
core that of ever being what he has always been - a practicing, dedicated doctor.

With Respect,

Gayle Teicher
4331 Reno Road, NW
Washington, DC 20008

The Honorable Richard J. Leon
United States District Court
For the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

and Ms. Susan Menzer
U.S. Attorney's Office
District of Columbia
555 4th Street N.W. Room 5834
Washington, D.C. 20277-6280

     From: Bill Whipple
     6610 Westmoreland Ave.
     Takoma Park, MD 20912
     Tel: 301-270-2808/Cell: 703-975-8739
     E-mail: billwhipple10@yahoo.com

     and Warren E. Whipple (Col, USMC retired)
     3610 Whispering Lane
     Falls Church, VA 22041
     703-941-5943

July 20, 2007

I am writing this letter for my father and myself in response to a request from the Justice Department to inquire if we have been impacted and of the general character of Dr. Douglas Greer.

Dr. Greer has only helped our family in the finest way and of the highest medical professionalism. In no way has any adverse activities affected our family by Dr. Greer. On the contrary, his action to help me and my dad have been exemplary.

All tests and procedures were prescribes and administered with a high mastery of skills. We have no knowledge of any test, procedure or charges that were unnecessary.

When my father was scheduled to go to surgery for an infectious discharge from one corner of the tear duck near his eye, our family doctor(since discharged) and the eye surgeons scheduled my dad to go to surgery immediately with minimal notice and with what we felt was inadequate examination. I felt a second opinion was needed and after much searching discovered Dr. Douglas Greer's office near American University would make a proper examination. Many of the eye doctors we called had switched to the highly lucrative laser corrective vision surgery business.

After completing a series of antibiotics, Dr. Greer examined my father's eyes, the antibiotic had served to drive out the infection, installing and sloping a hospital bed helped the infection and fluids to not run to his head and eyes. My dad's eye mended itself quickly. Dr. Greer's subsequent examination and equipment was able to tell that the infection had gone. Eye tests indicated that my dad at eighty-eight amazingly had better than 20-20 vision, no infection and did not need the expensive and questionably dangerous surgery.

When I (Bill Whipple) was personally scheduled to go to surgery for a torn retina and had severe reservations, concerns and needed a second opinion, Dr. Greer was able to give me advice and reassurance to answer many of my desperate questions. On one such occasion, Dr. Greer was on vacation and helped me by telephone and was of great assistance. In this case I was reassured and helped in a highly professional manner and with the highest compassion for the severe dilemma I faced.

The impact on our family is great and with much sadness. We feel the removal of such a highly competent professional, and with so many ophthalmologists moving to corrective eye surgery, there seems to less competent ophthalmologist available. Dr. Greer's high expertise is badly needed. We do not see how an insurance agent or government Medicare specialist could hope to dictate or match Dr. Greer's high expertise, compassion, and comprehension of the complexity of the eye.

Sincerely,
William T. Whipple

*William T. Whipple*

Col. Warren E. Whipple (USMC Retired)

*Warren E. Whipple*

6345 Dogwood Place
Falls Church, VA 22041
July 20, 2007

The Honorable Richard Leon
United States District Court
   for the District of Columbia
333 Constitution Av., N.W.
Washington, D.C. 20001

      Re: *U. S. v. Douglas F. Greer*, Case No.  1:07-CR-0095RJL (U.S.D.C., D.C.)

Dear Judge Leon:

      I am writing in support of my physician, Dr. Douglas F. Greer.   At present, Dr. Greer is scheduled to appear before you on July 26, 2007, in connection with the referenced matter.

      As a long-time patient of Dr. Greer, I have had the opportunity to observe his character.

      I first met Dr. Greer in the early 1970s.  At that time, Dr. Greer was affiliated with Georgetown University Hospital.  I, as a student of Georgetown University's Law Center, appeared at Georgetown's Student Health Department for medical treatment, and was treated by Dr. Greer..

      Throughout the subsequent years (almost forty), I have been treated by Dr. Greer for various conditions relative to my eyesight.   This treatment has primarily occurred as a patient in his private medical practice.

      The quality of the medical service I received from Dr. Greer has always been top notch, and reasonably priced.

      Dr. Greer is dedicated to the treatment of his patients.  For example, after suffering a dire circumstance that affected me financially, I felt I did not have sufficient funds to pay for a needed eye examination.  When I contacted Dr. Greer's office, I was told Dr. Greer would be willing to see me despite my financial situation.

      In treating me, Dr. Greer treated the whole patient and not just the patient's eyes.  He did this through expressions of concern about my well-being and matters affecting my well-being. This was far different from my experience with other physicians who seemingly spent as little time as possible with me, and cared less about matters affecting me.

Overall, I have found Dr. Greer to be kind, compassionate, and honest in every aspect of our doctor-patient relationship.

Respectfully yours,

Gloria Willingham

**Lester, Laura**

| | |
|---|---|
| **From:** | David Belyea [dbelyea@mfa.gwu.edu] |
| **Sent:** | Monday, July 23, 2007 12:39 PM |
| **To:** | Lester, Laura |
| **Subject:** | Fwd: Patient follow ups |

>>> David Belyea 7/23/2007 12:22 PM >>>
Dear Ms. Lester,
I would like to make an addendum to my letter regarding Dr. Greer's glaucoma and cataract patients. I have seen an additional 20 plus patients from Dr. Greer's practice since his retirement. All his patients have been treated to the standard of care for glaucoma and cataract diagnosis.
Sincerely,
David A. Belyea, MD



**CORNELL**
U N I V E R S I T Y

**NEW YORK
PRESBYTERIAN**
H O S P I T A L

**Joan and Sanford I. Weill
Medical College**

D. Jackson Coleman, M.D.
*The John Milton McLean Professor
of Ophthalmology
Chairman Emeritus
Department of Ophthalmology*

520 East 70th Street
New York, NY 10021
Telephone: 212 746-5588
Fax: 212 746-8732

July 19th, 2007

The Honorable Richard J. Leon
United States District Court
 for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC  20001

Re:  **United States vs. Douglas Greer**
     **Case No. 1:07-cr-00095-RJL**

Dear Judge Leon:

While I am not familiar with the details regarding Doug Greer's legal problem, I am quit familiar with Doug as a physician.

Doug trained with me many years ago at the Edward S. Harkness Eye Institute and I have followed his career in Washington. He is a fine and talented physician. I agree with Dr. Farris that medical coding is often difficult to follow particularly for a physician in private practice.  We in medical schools have staff to guide us and even then need constant guidance and course correction.

I would hope that you can afford some considerable leniency to a man whose career is already shattered and who has been one of only a few who take time to help the medically underserved.  I believe that Doug is an honest and ethical physician who deserves correction, not incarceration.

Sincerely,

D. Jackson Coleman, MD

### Settlement Agreement

This Settlement and Release Agreement ("Agreement") is entered into this 24th day of

July 2007, by and among the United States of America, acting through the United States

Attorney's Office for the District of Columbia (hereinafter "the United States"), and Douglas F.

Greer, M.D. and Douglas F. Greer, M.D., P.C. (hereinafter "Greer"). The United States and

Greer will hereinafter collectively be referred to as "the Parties."

## BASIS OF AGREEMENT

WHEREAS, the United States determined that Greer violated the False Claims Act when

he knowingly submitted claims for payment to Medicare and Federal Employee Health Benefit

Programs for services not rendered or not medically necessary during the period April 1, 2000

through December 31, 2006; and

WHEREAS, Greer has signed a Plea Agreement with the United States Attorney for the

District of Columbia regarding these claims as well as claims to private insurers; and

WHEREAS, as a result the United States has a valid cause of action under the civil

provisions of the False Claims Act, 31 U.S.C. § 3729, including treble damages and civil

penalties; and

WHEREAS, Greer desires to resolve these claims without litigation;

WHEREAS, the United States and Greer have engaged in negotiations concerning the

amounts paid and the civil penalties and damages referenced above; and

WHEREAS, the United States has asserted a demand against Dr. Greer for payment of

$1,000,000 to settle its civil claims under the False Claims Act for the Conduct referenced in

section 1, below.

WHEREAS, Greer has represented that he cannot pay the full amount of damages and penalties demanded, but has also represented that he possesses: (1) interest in the Douglas F. Greer, M.D., P.C. Employees Pension and Profit Sharing Plan with a value of $865,747 as of December 31, 2005 as well as other retirement funds reflecting a value of approximately $146,000 as of March 1, 2007 (collectively, the Retirement Accounts); (2) additional liquid assets of approximately $500,000.00 of which approximately $189,000.00 represents the limits potentially available under the Practice Guard Insurance policy (the "Practice Guard Insurance Limits"), and (3) clear title to a property located at 1811 47th Place, NW, Washington, D.C. ("Real Property") and assessed at a value of $536,500 in 2007,

THEREFORE, to avoid the delay, inconvenience and expense of protracted litigation of the damage claims set forth above, the Parties hereby reach a full and final settlement as set forth below.

## TERMS OF AGREEMENT

In consideration of the mutual promises, covenants, and obligations set forth below, and for good and valuable consideration as stated herein, the Parties agree and covenant as follows:

1.      The "Conduct" at issue in this Agreement is limited to the allegations contained above.

2.      Greer shall liquidate the funds from his Retirement Accounts; sell the Real Property; and access the $500,000. The total of these amounts, net of any amount necessary to pay taxes and costs related to the liquidation of the Retirement Accounts and the sale of the Real Property, shall be known as the Settlement Funds. With the exception of the Practice Guard Insurance Limits, the Settlement Funds shall be applied in the following manner: (1) to pay the criminal fines and restitution required by the Plea Agreement; and (2) to pay all taxes as set forth

in the Plea Agreement and resulting interest and penalties. All remaining Settlement Funds, plus the Practice Guard Insurance Limits shall be paid to the United States in satisfaction of the United States' civil claims under the False Claims Act for the Conduct. Nothing in this section shall affect Dr. Greer's obligation to make full restitution under the terms of the Plea Agreement.

3.    Greer shall provide to the United States specific documentation exactly detailing the monies obtained from the liquidation of the Retirement Accounts, the availability and amount of liquid assets, the actual payment of taxes related to the liquidation of assets, and the proceeds from the sale of the Real Property including the actual payment of any related capital gains taxes. Failure to provide adequate documentation shall be grounds for the United States to file a false claims act lawsuit regarding the allegations settled herein. The statute of limitations for those claims is agreed waived by the signing of this Settlement Agreement.

4.    In consideration of the obligations of Greer set forth in this Agreement, and conditioned upon Greer fulfilling the obligation set forth above, the United States (on behalf of itself, its officers, agents, agencies, and departments) releases Greer from any civil or administrative monetary claim the United States has or may have for the Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, restitution, breach of contract, and fraud.

5.    Notwithstanding any term of this Agreement, specifically reserved and excluded from the scope and terms of this Agreement as to any entity or person are any and all of the following:

(a) Any civil, criminal or administrative claims arising under Title 26, U.S. Code (Internal Revenue Code). Nothing in this paragraph or any other provision of this Agreement

3

constitutes an agreement by the United States concerning the characterization of the Settlement

Amount for purposes of the Internal Revenue Laws, Title 26 of the United States Code;

    (b) Any criminal liability;

    (c) Except as explicitly stated in this Agreement, any liability to the United States

(or their agencies) for any conduct other than the Conduct described above;

    (d) Any claims based upon such obligations as are created by this Agreement;

and

    (e) Any administrative or disciplinary action arising out of the conduct

at issue in this Agreement.

6.    The Parties will each bear their own legal and other costs incurred in connection

with this matter, including the preparation and performance of this Agreement.

7.    This Agreement is made in compromise of all disputed matters concerning the

Conduct described above.

8.    This document contains the complete agreement between the Parties and may not

be modified, amended or terminated except by written agreement signed by the parties and

specifically referring to this Agreement.

9.    This Agreement is governed by the laws of the United States.  The Parties agree

that the exclusive jurisdiction and venue for any dispute arising between and among the Parties

under this Agreement will be the United States District Court for the District of Columbia.

10.    The undersigned signatories for the United States and for Greer represent that

they are signing this Agreement in their official capacities and that they are authorized to execute

this Agreement on behalf of the Parties.

4

11.    Dr. Greer fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that Dr. Greer has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to the Covered Conduct in the United States' civil investigation and prosecution thereof.

12.    All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

AGREED TO:

_____
DOUGLAS F. GREER

_____
DOUGLAS F. GREER, M.D., P.C.

_____
ALAN E. REIDER
Counsel for Douglas F. Greer and
Douglas F. Greer, M.D., P.C.

_____
JEFFREY A. TAYLOR
United States Attorney

_____
RUDOLPH CONTRERAS
Civil Chief

_____
LAURIE WEINSTEIN
Assistant United States Attorney

5

```
1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2        --------------------------X

3        UNITED STATES OF AMERICA      Criminal Case No. 07-95

4                        v.

5        DOUGLAS F. GREER,

6                             Defendant,

7        --------------------------X      Washington, D.C.
                                          Thursday, May 3, 2007
8                                         11:40 A.M.

9                     TRANSCRIPT OF PLEA HEARING
                 BEFORE THE HONORABLE RICHARD J. LEON
10                  UNITED STATES DISTRICT JUDGE

11       APPEARANCES:

12       For the Government: SUSAN MENZER, AUSA
                             U.S. Attorney's Office
13                           Community Prosecution
                             555 Fourth Street, N.W.
14                           Washington, D.C.  20530
                             (202) 514-6968
15
         For the Defendant:  JOHN N. NASSIKAS, III, Esquire
16                           KAVITHA BABU, Esquire
                             ALAN REIDER, Esquire
17                           Arent Fox, PLLC
                             1050 Connecticut Avenue, N.W.
18                           Washington, D.C.  20036
                             (202) 857-6014
19

20       Court Reporter:       Lisa Walker Griffith, RPR
                               U.S. District Courthouse
21                             Room 6409
                               Washington, D.C.  20001
22                             (202) 354-3247

23

24       Proceedings recorded by mechanical stenography, transcript
         produced by computer.
25
```

1                      P R O C E E D I N G S

2          THE DEPUTY CLERK:  This is the United States of

3    America versus Douglas Greer.  Criminal Case Number 07-95.

4    We have Ms. Susan Menzer representing the government, and Mr.

5    John Nassikas, III, representing the defendant.

6          THE COURT:  All right.  Mr. Nassikas, I understand

7    your client wishes to enter a guilty plea in this case; is

8    that correct?

9          MR. NASSIKAS:  That's correct, Your Honor.

10         THE COURT:  Is he ready to go forward?

11         MR. NASSIKAS:  We are, Your Honor.

12         THE COURT:  Come on up.

13         MR. NASSIKAS:  Your Honor, also my colleague, Alan

14   Reider, who also is counsel of record in this case would

15   attend.  He's an expert in health care law.  And my other

16   colleague, Kavitha Babu, is also at the counsel table.

17         THE COURT:  All right.

18         MR. NASSIKAS:  Thank you.

19         THE COURT:  All right.  The witness will be sworn

20   please.

21         (The defendant was placed under oath.)

22         THE COURT:  All right, Mr. Greer, I need to ask you

23   certain questions to make sure that your plea is voluntary

24   and to make sure that you understand your rights under the

25   Constitution laws of the United States.

1     If you don't understand any of my questions at any

2  time, please do not hesitate to ask me to stop, and let me

3  know what issue you have or problems.  And we'll take a break

4  and you can talk to your counsel or the Court, and we'll do

5  our best to get you an answer to your question.  Okay?  Do

6  you understand that?

7          THE DEFENDANT:  Yes, Your Honor.

8          MR. NASSIKAS:  And, Your Honor, just again for the

9  record, Dr. Greer, remains a doctor even though he did

10 voluntarily surrender his practice as of about two weeks ago.

11 But he does remain a doctor even though unlicensed now

12 voluntarily.

13         THE COURT:  I understand.

14         Now, I want to remind you you're under oath.  So

15 the answers that you give to the Court's questions could be

16 used against you which would lead to prosecution for perjury

17 or making false statements if you don't answer truthfully.

18 Do you understand that?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  Does counsel for either side have any

21 question as to defendant's competence to enter a plea at this

22 time?

23         MR. NASSIKAS:  No, Your Honor.  As long as on the

24 record there's questions relating to medications the

25 defendant is taking that we do not believe will affect his

1    understanding of the proceedings today.

2            MS. MENZER:  Not from the government, Your Honor.

3            THE COURT:  All right.

4            Mr. Greer, are you taking any medications that, in

5    your judgment, would affect your ability to understand or

6    comprehend these proceedings today?

7            THE DEFENDANT:  No, Your Honor.

8            THE COURT:  Based on the representations of the

9    defendant and counsel and based on the Court's observation,

10    the Court finds defendant to be competent and capable to

11    perform a plea today.

12            As I understand, you wish to plea to one count of

13    health care fraud in violation of Title 18 U.S. Code Section

14    1347, and one count of filing a false income tax return in

15    violation of Title 26 U.S. Code Section 7206-1.  Have you had

16    an adequate time and opportunity to discuss this case with

17    your attorney?

18            THE DEFENDANT:  Yes, Your Honor.

19            THE COURT:  Are you satisfied with your attorney's

20    representations?

21            THE DEFENDANT:  Yes, Your Honor.

22            THE COURT:  Let me ask you a few brief questions

23    regarding your rights under the Constitution laws of the

24    United States.

25            First of all, you realize you're entitled to a

1    trial by jury as to the charges contained and the information

2    in this case?

3            THE DEFENDANT:  Yes, Your Honor.

4            THE COURT:  You understand if there were a trial,

5    you would be presumed to be innocent and that the government

6    would be required to prove you guilty by competent evidence

7    beyond a reasonable doubt?  Do you understand that?

8            THE DEFENDANT:  Yes, Your Honor.

9            THE COURT:  Furthermore, if there were a trial,

10   witnesses for the government would have to come to this

11   courtroom and testify in your presence.  Your attorney could

12   cross-examine those witnesses, check any evidence offered by

13   the government, and offer evidence on your behalf.  Do you

14   understand that?

15           THE DEFENDANT:  Yes, Your Honor.

16           THE COURT:  Furthermore, if there were a trial, you

17   would have a right to testify but also have the right not to

18   testify and no inference or suggestion of guilt could be

19   drawn from the fact that you chose not to testify.  Do you

20   understand that?

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  Now, if I accept your plea, you will be

23   waiving all these rights.  There would be no trial, enter a

24   judgment of guilty against you on these two counts.  Do you

25   understand that?

1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  Furthermore, do you understand that you

3    will be waiving your right against self-incrimination because

4    you have to acknowledge the guilt in order for me to accept

5    your plea of guilty to these counts?  Do you understand that?

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  Now, the offenses to which you're

8    pleading guilty are felony offenses.  If I accept your plea,

9    you'll be found guilty of those offenses and may, as a

10   result, be deprived of certain valuable civil rights, such as

11   the right to vote, the right to hold public office, the right

12   to perform certain jobs in both public and private sectors,

13   the right to serve on a jury and the right to possess any

14   kind of a firearm.  Do you understand that?

15             THE DEFENDANT:  What was the last thing?

16             THE COURT:  The right to possess any kind of a

17   firearm.

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  Now, you're a citizen of the United

20   States, are you not?

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  Having discussed all these rights with

23   you, Mr. Greer, do you still wish to go forward with the plea

24   today?

25             THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  If you could, Mr. Nassikas, if you

2    could put a copy of the information in front of Mr. Greer, I

3    would appreciate that.  If you don't have a copy, we've got

4    one here.

5          MR. NASSIKAS:  We do, Your Honor.

6          THE COURT:  Very good.

7          I'll ask just a few brief questions about this

8    document, Mr. Greer.  First of all, have you seen this

9    document before?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  Have you had a chance to review it and

12    discuss it with your counsel?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  Now, as I understand it, you wish to

15    plead guilty to two counts.  One count is a count in

16    violation -- of health care fraud, count in violation of

17    Title 18 U.S. Code Section 1347.  And the other is one count

18    of filing a false tax return in violation of Title 26 U.S.

19    Code Section 7206-1.  Do you waive the reading of this

20    information?

21          MR. NASSIKAS:  Yes, Your Honor, we move on to make

22    a few comments about certain paragraphs but, beyond that,

23    that is fine.

24          THE COURT:  All right.  Let me just ask you this.

25          Mr. Greer, do you understand the charges against

1    you here, both of these charges?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  And have you had a chance to discuss

4    with your counsel possible sentences you could receive if I

5    accept your plea in this case?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  Do you understand that the maximum

8    penalty in the health care fraud conviction count is ten

9    years imprisonment, a fine of twice the pecuniary gain or

10   loss, pursuant to 18 U.S. Code Section 3571-D, and a

11   five-year term of supervised release, an order of restitution

12   and an obligation to pay any applicable interest in penalties

13   on fines and restitution?  Do you understand that?

14             THE DEFENDANT:  I do, Your Honor.

15             THE COURT:  And with regard to the tax events, you

16   understand that the maximum penalty under the law for filing

17   a false tax return is three years imprisonment, a fine of a

18   hundred thousand dollars and a one-year term of supervised

19   release?  Do you understand that?

20             THE DEFENDANT:  I do, Your Honor.

21             THE COURT:  Now, the Court, of course, will

22   sentence you in this case but only after a presentence

23   investigation has been conducted and a report has been

24   prepared, which you and your counsel and the government's

25   counsel will all have an opportunity to review, and challenge

1    any factual or legal conclusions that are reached.  You

2    understand that, don't you?

3             THE DEFENDANT:  I do, Your Honor.

4             THE COURT:  Under some circumstances, you may have

5    a right to challenge the sentence imposed by the Court,

6    particularly with regard to its reasonableness or its

7    legality.  Do you understand that?

8             THE DEFENDANT:  Yes, Your Honor.

9             THE COURT:  Are you aware that parole has been

10   abolished in the federal system, that if you are sentenced to

11   prison, you will not be released on parole?  Do you

12   understand that?

13            THE DEFENDANT:  I do, Your Honor.

14            THE COURT:  Now, if you could, Mr. Nassikas, put

15   the plea agreement, I think you might have the original

16   there.  I don't have a copy myself.

17            MR. NASSIKAS:  The original is now being handed to

18   me, Your Honor.  And, Your Honor, do you want me to make any

19   comments about the criminal information, the factual

20   allegations now?

21            THE COURT:  No, we'll get to that.

22            MR. NASSIKAS:  Thank you.

23            THE COURT:  If you could turn to the plea agreement

24   itself, the letter of April 19, 2007, addressed to you, Mr.

25   Nassikas.

1          MR. NASSIKAS:  Thank you, Your Honor.  We have it.

2          THE COURT:  All right.  I want to ask you a few

3    questions about this document.

4          Mr. Greer, first of all, have you seen this

5    document before?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Have you had a chance to read it and

8    discuss it with your counsel?

9          THE DEFENDANT:  I have, Your Honor.

10         THE COURT:  All right.  You believe you understand

11   this document?

12         THE DEFENDANT:  I believe I do, yes, Your Honor.

13         THE COURT:  If you could turn, Mr. Nassikas, to the

14   last page of the document.

15         Is this your signature on this page, Page 5,

16   acknowledging and accepting the terms and conditions of this

17   plea agreement?

18         THE DEFENDANT:  It is, Your Honor.

19         THE COURT:  Mr. Nassikas, is this your signature on

20   that page as well acknowledging the same?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  Very good.

23         Now, I believe, as a part of this plea agreement,

24   there's a statement of the offense which is pretty lengthy.

25   It's about 12 pages here.  Let me ask you a few questions

1    about this document.  First of all, have you seen this

2    document before?

3              MR. NASSIKAS:  The statement of the offense?  One

4    moment, Your Honor.

5              THE COURT:  Take your time.

6              MR. NASSIKAS:  Yes.  We have that in front of us.

7              THE COURT:  All right.  If you could take a moment,

8    Mr. Greer, and take a look at this particular document here,

9    I want to ask you if you have seen this document before?

10             THE DEFENDANT:  I have, Your Honor.

11             THE COURT:  Have you had a chance to read it and

12   discuss it with your counsel?

13             THE DEFENDANT:  I have, Your Honor.

14             THE COURT:  All right.  And you believe you

15   understand this document?

16             THE DEFENDANT:  I believe I do, Your Honor.

17             THE COURT:  All right.  Now turning to Page 12, is

18   this your signature on Page 12 acknowledging and accepting

19   the truth and accuracy of the information contained in this

20   document?

21             MR. NASSIKAS:  Your Honor, we have not executed

22   that signature because the document we had from the

23   government did not have a signature line.  But we understood

24   we'd sign it in open court.

25             THE COURT:  Very good.  If you believe it's true

1    and accurate, Mr. Greer, please sign that page.

2              MR. NASSIKAS:  Your Honor, there are a few comments

3    about the statement of the offense that I would like to make

4    at the appropriate time.

5              THE COURT:  All right.  Before we get to that,

6    let's go back to that plea agreement a second.  I realize

7    now, that I forgot to mention the fact that you and the

8    prosecutor in this case have executed a slight modification

9    to Paragraph 12, if you could describe that for the record

10   please.

11             MR. NASSIKAS:  Yes, Your Honor.  One moment.

12             On the fourth page, Your Honor, of the plea

13   agreement dated April 19, 2007, Paragraph 12 entitled U.S.

14   Attorney Office's Criminal Division Bound, there has been a

15   written, handwritten interlineation at the end of the first

16   sentence that adds, "and the U.S. Department of Justice, tax

17   division."  And that addition has been initialed by Ms.

18   Menzer and myself and Dr. Greer.

19             THE COURT:  So, the whole sentence reads now what?

20             MR. NASSIKAS:  The whole sentence now reads that,

21   "Dr. Greer understands that this agreement is binding only

22   upon the criminal division of the United States Attorney's

23   Office for the District of Columbia and the U.S. Department

24   of Justice, tax division."

25             THE COURT:  Very good, all right.

1          You signed that also, right, Mr. Greer?

2          THE DEFENDANT:  Yes, I initialled it, Your Honor.

3          THE COURT:  Very good, all right.

4          Now, why don't you describe for the record briefly,

5   Mr. Nassikas, the, in general terms, the terms of this plea

6   agreement here.  I'll ask a couple of questions afterwards,

7   Mr. Greer.

8          MR. NASSIKAS:  Your Honor, the two counts, the

9   health care fraud count and the tax count, the health care

10  fraud count has a description of Dr. Greer's performing

11  certain number of tests and procedures and billing for those

12  tests and procedures that were not deemed by the insurance

13  companies to be medically necessary, and therefore Dr. Greer

14  admits to having over billed the Medicare and private

15  insurers as described in that offense.

16         Secondly, Your Honor, there is the income tax count

17  that focuses on the year, I believe, 2001.  And that count

18  describes having Dr. Greer's having taken business expenses

19  on behalf of his P.C. that were actually personal expenses

20  and therefore not under reporting the amount of income on the

21  personal side of the tax return that he subsequently

22  subscribed.  So there is an under payment of taxes reflected

23  in that count, Your Honor.

24         Beyond that brief summary description of the

25  statement of the offense, Your Honor, the comments I would

1    make, and Ms. Menzer is aware --

2         THE COURT:  I want you to describe the plea

3    agreement, the terms of the plea agreement.

4         MR. NASSIKAS:  The terms of the plea agreement

5    itself, the summary of the plea agreement itself, Your Honor,

6    is just simply that Dr. Greer does knowingly and voluntarily

7    accept responsibility for his actions described in the

8    statement of the offense and admits to the two counts that

9    are referred to in the plea agreement.

10         In terms of two counts, there is a criminal

11    information that the government has submitted and filed.  And

12    it does contain facts that do go beyond the facts that

13    Dr. Greer admits to in the statement of the offense.  I'm

14    happy to make those points on the record if this is the

15    appropriate time to do so, Your Honor.

16         THE COURT:  I want to go over the terms of the plea

17    agreement.  What's the government giving, what's the defense

18    giving up besides admitting the offenses?

19         MR. NASSIKAS:  The government is now agreeing to

20    not pursue any further charges against Dr. Greer.  Also, they

21    have agreed in this plea agreement not to pursue any charges

22    against Annette Greer, who is in the courtroom today, Dr.

23    Greer's wife.  There is a, the government and the defense

24    have a dispute over a couple provisions in the sentencing

25    guidelines that will be, I'm sure, briefed at a later point.

1      THE COURT:  Does it make it clear that the Court's

2  not bound by any calculation by the parties in this case with

3  regard to sentencing guidelines?

4      MR. NASSIKAS:  Absolutely, Your Honor.  The

5  agreement, in fact, specifically indicates that the Court is

6  the ultimate decider here, appropriately so, and that the

7  factors listed under Title 18 United States Code Section 3553

8  will be very much considered by the Court and applied to the

9  ultimate result in this case.

10      That what we lay out in Paragraph 3 under the

11  federal sentencing guidelines is simply the guideline

12  sections that the parties agree apply in the calculation

13  there.  However, both sides know the Court is the ultimate

14  decision-maker based on all of the input from the parties and

15  the U.S. Probation Office.

16      THE COURT:  Wouldn't that also apply to

17  restitution?  Doesn't the Court decide what the restitution

18  is in the case?

19      MR. NASSIKAS:  Yes, Your Honor.

20      THE COURT:  So separate and apart from what's in

21  Paragraph 4, it's the Court's decision, not what's in

22  Paragraph 4?

23      MR. NASSIKAS:  That's correct, Your Honor.  And

24  again, there is a separate civil agreement that is referred

25  to in the context of this plea agreement, and that civil

1    agreement has -- the final terms of that agreement have been

2    reached and we expect, both parties expect that to be

3    executed probably by tomorrow.  That agreement also refers to

4    the criminal restitution as part of a global settlement of

5    this case.

6           Nevertheless, Your Honor, of course, the Court will

7    determine the final appropriate number there based on the

8    financial circumstances of the Greers and all of the

9    information that will be provided to the Court.

10          THE COURT:  So, if the Court should decide that

11   appropriate restitution is greater or lesser than $1,011,467,

12   that will be what is controlling, will it not?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Okay.  How about allocution?

15          MR. NASSIKAS:  And on allocution, Your Honor, the

16   United States obviously will be reserving its right to

17   allocute for purpose of sentencing.  There is an

18   acknowledgement that the government does not intend to file

19   downward departure under 5K1.1 in this case.  The defense, of

20   course, is going to be itself presenting extensive

21   information for the Court to put this case in a total

22   truthful context because it covers a period of time 1999

23   through 2002, a historic period of time.  We will describe

24   that for the Court's benefit.

25          The government is agreeing not to recommend and to

1   refrain from recommending a particular resolution of the

2   sentencing issue.  I believe in Paragraph 7, the government

3   reserves the right to full allocution if there is any post

4   sentence litigation.

5         THE COURT:  The government is not going to oppose

6   release pending sentencing, is that right?

7         MR. NASSIKAS:  No, that's expressly agreed to in

8   this agreement, Your Honor.

9         THE COURT:  Okay.  Of course the Court wouldn't be

10  bound by any recommendation in any event, would it?

11        MR. NASSIKAS:  Would not, Your Honor.  But the

12  government has discussed obviously being agreeable to bond in

13  this context.

14        THE COURT:  Right.  Now, what about consequences if

15  there is a breach of the agreement?

16        MR. NASSIKAS:  Consequences of a breach, Your

17  Honor, there's an opportunity for a hearing to determine if

18  in fact there has been a material breach of the agreement.

19  But if there were deemed to be, ultimately by the Court, a

20  breach, it is possible that then the plea agreement would be

21  abrogated.

22        THE COURT:  So the Court's the final arbiter

23  whether the breach has occurred?

24        MR. NASSIKAS:  And as a defense counsel, I always

25  like having the Court as the final arbiter, Your Honor.

1    THE COURT:  Are there any other provisions that we

2    need to describe here?

3    MR. NASSIKAS:  I mean, Your Honor, Dr. Greer has

4    reviewed all of the provisions here.  This is obviously the

5    complete agreement of the parties, contained in all plea

6    agreements.  There are not side agreements here.  There are

7    not side understandings.

8    THE COURT:  As I understand it, there are a few

9    paragraphs in the information that are not specifically being

10   acknowledged in the statement of the offense by Mr. Greer; is

11   that right?

12   MR. NASSIKAS:  That's correct, Your Honor.

13   THE COURT:  Paragraphs 12 through 14, is that

14   right, a part of Paragraph 12?

15   MR. NASSIKAS:  Exactly, Your Honor.  To be very

16   clear, Paragraph 12 is the references in that paragraph to

17   examinations in diagnostic testing.  Those references in the

18   context of what is described in Paragraph 12 go beyond what

19   the statement of the offense refers to and what Dr. Greer

20   accepts.

21   However, the surgical procedure language is

22   accurate in the context of this paragraph and consistent with

23   the statement of the offense in that there is reference to

24   lasers following cataract surgery in the statement of the

25   offense, which we understand would be the reference to

1    surgical procedures there.

2            Paragraph 13, Your Honor, is new factual language

3    that goes beyond the scope of the admitted statement of the

4    offense.

5            Paragraph 14 also goes beyond the statement of the

6    offense.  As the government knows, I think it was a year ago,

7    we presented affirmative evidence disagreeing with that

8    characterization.  The government obviously disagreed.

9            Nevertheless, we would ask that the portion of

10   Paragraph 12 that I have described and Paragraphs 13 and 14

11   since they are unnecessary to a plea to these two offenses

12   that, and because Paragraph 14 in particular contains in our

13   view inflammatory incorrect information, that they be

14   stricken from this statement, from the criminal information,

15   again which went beyond the bargain between the parties as

16   described in the plea agreement.

17           THE COURT:  In any event, he's not admitting to

18   those as part of the statement of the offense?

19           MR. NASSIKAS:  No, Your Honor.  That's correct.

20           THE COURT:  Very good.

21           All right.  Is there anything else you want to note

22   at this point, Mr. Nassikas?

23           MR. NASSIKAS:  Yes.  In the statement of the

24   offense itself, Your Honor, so it is clear, because the

25   statement of offense begins Dr. Greer agrees and stipulates

1    and then there are a number of paragraphs that follow.  There

2    is certain language here that we, you know, in good faith,

3    are relying on the government and its agents for the

4    calculations in terms of the number of Medicare beneficiaries

5    and the exact dollar amount of the loss.

6            We accept it but we're unable to review the

7    voluminous computer calculations and have not had the ability

8    to kind of go and pull, the time or the ability, the specific

9    files to determine the precise number of Medicare

10   beneficiaries.

11           For example, Your Honor, the last sentence of

12   Paragraph 2 refers to between 1999 and 2002, Dr. Greer

13   provided services to 429 Medicare beneficiaries.  We accept

14   that the government has the proof of that.  But we have not

15   been able independently to verify that.

16           Similarly, last paragraph of Paragraph 4, refers to

17   778 subscribers.  Just to quantify, Paragraph 7 refers to

18   23 percent of payments.  Paragraph 7 also refers to the

19   obtaining of $282,018 from Medicare so on and so forth.

20           There were references to specific percentages,

21   specific dollar amounts and specific number of beneficiaries.

22   Again, we accept the government has determined that.  But

23   Dr. Greer does not have the independent first-hand ability to

24   say yes, that's the exact amount.  Some of this is presumably

25   an approximation, Your Honor.

1    In the first paragraph, there is a reference to Dr.

2  Greer providing in the present tense medical services for

3  patients.  As I indicated to the Court at the beginning of

4  the proceeding, he voluntarily surrendered his licenses in

5  the three jurisdictions and no longer provides them.  But for

6  all times relevant to this matter, he has provided medical

7  services for patients in the District of Columbia and the

8  Commonwealth of Virginia.  The Court's indulgence, Your

9  Honor.

10    There is also, Your Honor, a number of references

11  to the term medically unnecessary.  That is a term of art

12  which we presume the Court understands.  This would be laid

13  out in papers, would be presented as part of the

14  presentencing process, but that term does not, is not the

15  equivalent of medically wrong.

16    It's simply billing Medicare or other insurance

17  programs only beyond what they deemed to be medically

18  necessary services.  And medically unnecessary is a term of

19  art within the insurance context here.  We don't want there

20  to be any confusion that that means at all that it was

21  medically wrong for Dr. Greer to do what he did.

22    THE COURT:  All right.

23    MR. NASSIKAS:  He accepts that it was wrong to bill

24  for what he did but not to have performed what he did.

25    THE COURT:  All right.  Mr. Greer, you've heard the

1    description that your counsel has provided of the terms of

2    the plea agreement here.  And his additional notations with

3    regard to the document that's incorporated by reference into

4    the plea agreement, which is the statement of the offense.

5            First of all, does this sound consistent with your

6    understanding of the plea agreement and the statement of the

7    offense?

8            THE DEFENDANT:  Yes, it sounds consistent, Your

9    Honor.

10           THE COURT:  All right.  Do you have any

11   disagreement or quarrel with his descriptions in any way?

12           THE DEFENDANT:  No, I do not, Your Honor.

13           THE COURT:  Let me ask you this.  Has anyone

14   threatened you in any way or forced you to enter a plea of

15   guilty in this case?

16           THE DEFENDANT:  No, Your Honor.

17           THE COURT:  All right.  Has anyone given you any

18   specific prediction or promise as to what your sentence will

19   be in this case?

20           THE DEFENDANT:  Various people have speculated.

21           THE COURT:  But has anyone made a prediction with

22   specificity or promise?

23           THE DEFENDANT:  No promise.

24           THE COURT:  You understand that the Court of law

25   will decide what the sentence is that's appropriate in this

1    case?

2            THE DEFENDANT:  I understand that, Your Honor.

3            THE COURT:  The Court is not in a position to do

4    that until it receives a presentence investigation report,

5    which you will have a chance to, not only provide information

6    for with your counsel's assistance, but you will have a

7    chance to review it as will counsel and government's counsel

8    in advance of any sentencing.  And you will have an

9    opportunity to object to any conclusions, factual or legal or

10   both, that may be contained in that before I even see it.

11   You understand that?

12           THE DEFENDANT:  I understand that, Your Honor.

13           THE COURT:  Then, of course, on the day of

14   sentencing, your counsel and you will each have an

15   opportunity to address the Court if you like on that occasion

16   with regard to what the appropriate sentence is.  Do you

17   understand that?

18           THE DEFENDANT:  I understand that, Your Honor.

19           THE COURT:  All right.

20           Now, what I'm going to do is I'm going to give the

21   government counsel a chance to describe in general terms the

22   offenses that they would have proven if this case had gone to

23   trial.  Listen carefully.  I'll ask you a few brief questions

24   with regard to the government's description of what it would

25   have proved.  So you can have a seat with your counsel.

1          MR. NASSIKAS:  Your Honor, we do have the executed

2    statement of the offense.  Would you like me to hand that up

3    at this time?

4          THE COURT:  Oh, sure, I have a copy of it.

5          MR. NASSIKAS:  But this is the signed statement of

6    the offense, Your Honor.

7          THE COURT:  Yes.

8          MR. NASSIKAS:  And then there are two forms, the

9    waiver of indictment and the waiver of trial by jury which

10   we've not executed yet if you'd like us to execute it.

11         THE COURT:  You can sign them when you are over at

12   that table.

13         MR. NASSIKAS:  Okay.  Thank you, Your Honor.

14         THE COURT:  It's probably a good idea.

15         All right.  Ms. Menzer.

16         MS. MENZER:  Thank you, Your Honor.  Your Honor, I

17   do know that the Court has had the benefit of the statement

18   of offense, which I do apologize is rather lengthy but

19   involves a number of medical terms that needed to be

20   explained.  Just for the record, Your Honor, from the

21   government's perspective, billing for medically unnecessary

22   services is in fact a crime.  It is not a term of art.  It is

23   a crime and that's what the government has alleged in its

24   information and what Dr. Greer is pleading guilty to today.

25         If this case had proceeded to trial, the government

1    would have shown, by clear and competent evidence and beyond

2    a reasonable doubt, that between 1999 and 2002, Douglas Greer

3    was an ophthalmologist practicing in Washington, D.C. in

4    Annandale, Virginia.  He serviced approximately 429 Medicare

5    patients and 778 patients, many of which were members of the

6    Federal Health Benefit Plan Program and other private

7    insurance companies.

8           With respect to his billing practices, the

9    government would have shown that Dr. Greer performed or

10   billed for performing numerous diagnostic tests that are

11   mostly used to diagnose people with glaucoma.  According to

12   his own records, he billed for these diagnostic tests only

13   23 percent of those patients required them.  They were only

14   medically necessary for 23 percent of those patients.

15          He also performed what's known as an extended

16   Ophthalmoscopy, O-P-T-H-A-L-M-O-S-C-O-P-Y, which is a very

17   extensive look at the back of someone's eyes.  Only

18   17 percent of the bills that he submitted, only 17 percent of

19   those claims by his own diagnostic were medically necessary.

20          He also billed for what's known as fundus

21   photography, which again is taking pictures at the back of

22   someone's eyes to be able to make a diagnostic decision.  He

23   had a technician who took very clear, medically sound

24   photographs of people's eyes.  But in addition, Dr. Greer

25   took his own photographs and billed for those, many of which

1    were clearly unusable.

2           In terms of surgery, Dr. Greer performed numerous

3    cataract surgeries on many patients.  With respect to,

4    there's a rare complication which would require because of

5    the heat that's generated during the cataract surgery, would

6    require a graft, a scleral graft, which is S-C-L-E-R-A-L,

7    only, according to statistics, only one in 1,000 of those

8    surgeries require that.

9           However, between 1999 and 2002, Dr. Greer billed

10   that specific code 108 times.  Your Honor, if this case had

11   gone to trial, the government would also have presented

12   expert testimony to show that this was in fact not performed.

13          In addition, another complication that occurs for

14   people that have cataract surgery, a laser procedure with a

15   yag laser, Y-A-G, is required.  It's a yag caps-ulotomy,

16   C-A-P-S-U-L-O-T-O-M-Y.  This procedure is done in order to

17   open up so that the people who have had cataract surgeries

18   can see again.  There is a cloudiness that occurs.

19          And according to medical experts, this is rarely

20   done within the first three months of surgery.  It's rarely

21   needed.  And it is rarely needed to be repeated.  However,

22   Dr. Greer performed this many times during the first three

23   months and repeated it over and over again for the same

24   patients.

25          In order to be paid for it, he appended a modifier

1    to those claims, a modifier 79, which indicated that that was

2    unrelated to the original surgery.  And therefore the

3    insurance companies paid it unknowingly and they shouldn't

4    have.

5         He also performed numerous laser surgeries or

6    billed for performing numerous laser surgeries for people who

7    were suffering from glaucoma.  In particular, there is one

8    procedure, which is known as an argon, A-R-G-O-N, laser

9    trabeculoplasty, T-R-A-B-E-C-U-L-O-P-L-A-S-T-Y.  And those

10   are for people who suffer from what's known as open-angle

11   glaucoma.

12        Dr. Greer, however, billed for performing this

13   laser procedure on many patients who, in fact, were not

14   diagnosed with that condition.  In addition, he performed two

15   other laser procedures, an iridotomy, I-R-I-D-O-T-O-M-Y, an

16   iridoplasty, I-R-I-D-O-P-L-A-S-T-Y, that are typically

17   performed on people who have closed-angle glaucoma.

18        Dr. Greer billed for performing that procedure on

19   numerous people who again were not diagnosed with suffering

20   from closed-angle glaucoma.  In total, Dr. Greer has agreed

21   that his fraudulent billing, he obtained $1,011,467 from

22   Medicare, federal employee health plans as well as private

23   insurance companies.

24        And, Your Honor, if this case had gone to trial, I

25   understand there is a dispute and we'll discuss that at

1    sentencing, the government again would have shown, and Dr.

2    Greer is not today agreeing to that, but the government would

3    have shown that on several instances in which he was audited

4    by insurance companies, he in fact subsequently altered

5    medical records.  The government argued it would be to

6    conceal his fraudulent conduct.

7           With respect to --

8           THE COURT:  It's not necessary that he agree to

9    that today for purposes --

10          MS. MENZER:  Exactly, Your Honor.  But if this case

11   had proceeded to trial, that's what the government would have

12   shown.  We understand there's a dispute there.

13          With respect to the tax fraud, if this case had

14   gone to trial, the government would have shown for the years

15   2000, 2001, and 2002, that Dr. Greer paid for numerous

16   personal expenses throughout the corporation.  And as a

17   result, he deducted those expenses from his corporate tax

18   returns for both the federal and the District of Columbia tax

19   returns.  And he didn't include them in his income on his

20   personal income tax returns for the Federal Government and

21   the D.C. income tax.

22          This would also include he paid his children and

23   his housekeeper's salaries out of the corporation.  He took

24   charitable contributions for money that he paid to a

25   501(C)(3) organization that he himself created that

1    purportedly was to perform medical care to indigent patients.

2    He took these contributions knowing that the money that he

3    paid into that charity, many of the funds were used to pay

4    for his family's yearly vacation in the Cayman Islands.

5           As a result of these false tax returns with the

6    federal and the D.C. government, Dr. Greer understated his

7    taxes for the federal government for these three years

8    $141,000 approximately, and for the D.C. government,

9    approximately $46,000.

10          THE COURT:  This is all contained in the statement

11   of fact?

12          MS. MENZER:  Yes, it is, Your Honor.

13          THE COURT:  Very good.

14          One other thing, Ms. Menzer.  Do you agree with the

15   Court, I assume, but you can tell me if you disagree, that as

16   to the amount of restitution, the Court alone determines the

17   appropriate amount of restitution?

18          MS. MENZER:  Yes, it is, Your Honor.

19          THE COURT:  Very good.  You can come back up,

20   Doctor.

21          Dr. Greer, you've heard the description of the

22   offenses, the evidence that the government believes it could

23   prove if this case had gone to trial.  Now, separate and

24   apart from those areas of disagreement, which your counsel

25   has already outlined, separate and apart from those, as to

1    those factual recitations that were made contained within the

2    statement of the offense, is that an accurate and complete

3    summary of your conduct in this case?

4            THE DEFENDANT:  Well, it all went very fast, and I

5    didn't get a chance to make notes.  But, for openers, I would

6    say that there are many things that she said which were

7    somewhat misleading.

8            THE COURT:  All right.

9            Well, with regard to the statement of the offense,

10    you've had a chance to review that and sign it and accept it

11    as true and accurate.  Is it not your intention to

12    acknowledge your guilt by accepting as true and accurate the

13    information contained in the statement of offense?

14            THE DEFENDANT:  Would you say that again, Your

15    Honor?

16            THE COURT:  You've had a chance to review the

17    statement of the offense, have you not?

18            THE DEFENDANT:  I have.

19            THE COURT:  You've had a chance to discuss it with

20    your counsel, have you not?

21            THE DEFENDANT:  I have.

22            THE COURT:  You've told this Court under oath a

23    matter of minutes ago, that as to the information contained

24    in that statement of the offense, that you believe it is

25    complete and accurate.  Isn't that right?

1         THE DEFENDANT:  I did.

2         THE COURT:  Very good.

3         So, to the extent that Ms. Menzer's description

4 contained facts that are contained in that statement of

5 offense, you acknowledge that those are true and accurate, do

6 you not?

7         THE DEFENDANT:  Can I consult with my attorney for

8 a moment?

9         THE COURT:  Sure you can.

10         (There was a pause in the proceedings.)

11         THE DEFENDANT:  Consistent with, but as I said, in

12 some cases misleading there were some drama -- may I give you

13 an example?

14         THE COURT:  No, you don't need to do that.  I'm

15 just trying to make sure there's no question on this record

16 that, as to the description of your conduct that's contained

17 in the statement of the offense, to the extent that she

18 covered it as it is contained in the statement of offense, is

19 it your testimony today under oath that that is complete and

20 accurate?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Very good.  So you are pleading guilty

23 because you are in fact guilty to these two offenses, is that

24 right?

25         THE DEFENDANT:  That is correct.

1          THE COURT:  All right.  You're doing so

2     voluntarily, is that right?

3          THE DEFENDANT:  It is, Your Honor.

4          THE COURT:  Now, do you have any questions that

5     you'd like to ask your counsel or the Court before I accept

6     your plea, recognizing that, once I accept it, I'm not likely

7     to allow you to change your mind and withdraw it.  So if you

8     have any questions, or if you'd like to ask either your

9     counsel or the Court, this would be the time to do it.

10          Any questions?

11          THE DEFENDANT:  Do you determine the period of time

12     between today and sentencing?

13          THE COURT:  Well, I'm the one who sets the

14     scheduling, yeah.  So I'll decide when the sentencing date

15     is.  Of course, I consult with counsel as to what the

16     appropriate date is for their schedule as well as the

17     Court's.  We try to pick a date that works for their schedule

18     as well as the Court's.  They could be in trial somewhere,

19     essentially, we pick a date that works for counsel and the

20     Court.

21          THE DEFENDANT:  May I consult with my attorney for

22     a moment?

23          THE COURT:  Sure.

24          (There was a pause in the proceedings.)

25          THE DEFENDANT:  I have no further questions, Your

1    Honor.

2           THE COURT:   All right.   So you still want to enter

3    your plea of guilty.   Is that right?

4           THE DEFENDANT:   I do, Your Honor.

5           THE COURT:   All right.   I find, the court,

6    defendant knows his rights under the Constitutional laws of

7    the United States regarding self-incrimination and regarding

8    a trial by jury chose to waive those rights voluntarily.   The

9    Court finds that the defendant's aware of the maximum

10   possible punishment for each of the offenses to which he is

11   pleading guilty.

12          The Court finds that his plea is knowing and

13   voluntary and supported by an independent basis in fact as to

14   each of the essential elements of the offense.   So I will

15   accept your plea and enter a judgment of guilty to one count

16   of health care fraud in violation of Title 18 U.S. Code

17   Section 1347 and one count of filing false tax returns in

18   violation of Title 26 U.S. Code Section 7206-1.

19          A written presentence report will be prepared by

20   probation to assist me in sentencing in this case.   You will

21   be asked to provide information for that report.   Your

22   attorneys will be present if you wish.   You will, of course,

23   have opportunities to read that report, as will your counsel

24   and government counsel before it's submitted to the Court.

25   You will have an opportunity to object to any factual legal

1    conclusions that are contained therein.

2            Now, let's talk about a sentencing date here.

3            You can have a seat, Mr. Greer.

4            Counsel, we usually take about 75 days or so to

5    prepare a presentence investigation report.  That would get

6    us to some time in July I'd say, about mid to late July.

7            MR. NASSIKAS:  A mid July would work fine or toward

8    the end of July, Your Honor.  Whatever is convenient for the

9    Court.  I just would need to consult with co-counsel.

10            THE COURT:  All right.  Well, let's see, how about

11    July 23, counsel, at 2:00 o'clock.

12            MR. NASSIKAS:  Is it possible, Your Honor, to do it

13    on a Tuesday, Wednesday or a Thursday as opposed to a Monday

14    or a Friday that week?

15            THE COURT:  I have a hearing all day Tuesday and

16    Wednesday.  But we can do it the 26th, certainly.

17            MR. NASSIKAS:  That would work fine, Your Honor.

18            THE COURT:  How is that for you, Ms. Menzer?

19            MS. MENZER:  Your Honor, my only -- I'm not

20    concerned about the date.  I'm concerned about how much time

21    the Court's going to devote to the sentencing hearing.  It

22    sounds to me, based upon what defendant's telling the Court

23    that they're disputing some of the government's evidence that

24    we may put in our sentencing memo.

25            We may need to, because you're the judge, you do

1  have the right to decide whether or not any of these facts

2  are true or not.  I'm just wondering if there is going to be

3  any evidence submitted, whether or not we need more than the

4  typical hour or two hours.  I don't know what defense plans.

5  Sounds to me that --

6         THE COURT:  I don't see why.  You have a dispute.

7  The parties have a dispute as to a, what appears to me to be

8  a very limited amount of facts in this case.  Certainly, if

9  you just put those aside for a moment, based on a quick

10 review of the statement of the offense, there is more than

11 enough evidence, which has been acknowledged by the

12 defendant --

13        MS. MENZER:  I understand that, Your Honor.

14        THE COURT:  -- to make out the case as to each

15 essential element.  I don't see any necessity at all for the

16 Court to reach any ruling as to the facts that are in

17 dispute.  I don't intend to unless I have to.  I don't see

18 any reason legally why I would have to.  So as of right now,

19 I wouldn't expect to spend a minute on any disputes in the

20 facts in this case, unless you can show me a reason why I

21 need to.

22        MS. MENZER:  That's fine, Your Honor.

23        I was just concerned with the arguing what was

24 medically necessary and unnecessary and that there was going

25 to be some voluminous filing that the government would need

1    to dispute for the Court's benefit.

2         MR. NASSIKAS:  I don't see that coming, Your Honor.

3         THE COURT:  I normally put aside about an hour or

4    so for a sentencing.  Sometimes it takes a little longer.

5    Sometimes it takes a little less.

6         MS. MENZER:  That's fine, Your Honor.

7         THE COURT:  You know, I certainly would be more

8    than glad to block an hour and a half if you think there may

9    be additional things that need to be discussed than normal.

10        MR. NASSIKAS:  Your Honor, the 3553 factors that we

11   laid out succinctly for the Court I would think could be

12   succinctly dealt with by the Court also.

13        THE COURT:  Well, that is my focus.  I realize that

14   the Court of Appeals wants me to give it a ruling as to what

15   the appropriate guideline range is.  I'll do that.  But my

16   focus is really the other factors.  I'm not really expecting

17   counsel to spend hardly any time whatever on the guideline

18   range.  He can spend a little time on it, but I think the

19   principal focus has to be the other factors.

20        And I would strongly urge you to, in your

21   sentencing memo, I require the government to do a sentencing

22   memo, the defense also does one, but I require the government

23   to do one.  So I would strongly urge you to just focus

24   primarily on those 3553 factors.  I mean, you can spend some

25   portion of the memo dealing with the guidelines range but my

1   sense is that that's not going to be any major portion of the

2   discussion on that day.  I just don't see it at this point.

3         So, I require the sentencing memo to be in a week

4   in advance, which would be the 19th, so that I have time to

5   read it and meet with probation to discuss it with probation.

6   Now, obviously, for some reason either side or both were to

7   be late in getting their sentencing memo, I'd have to

8   reconsider the date because I need time to not only read it

9   but I need to meet with probation and go over with them and

10  get the benefit of their thinking on this issue.

11        MR. NASSIKAS:  We'll not be late, Your Honor.

12        THE COURT:  So if you all can get those in on the

13  19th, that would be great.  Then this is probably not an

14  issue in this case, but in some cases, parties want to submit

15  videotapes and CDs and things.  I'm not really, I don't go

16  for that because I don't think that's transparent.  So, if

17  you have any notion of doing that kind of thing, don't do it.

18  Put it in writing.

19        MR. NASSIKAS:  We tend to write and talk, Your

20  Honor.  We don't use pyrotechnics.

21        THE COURT:  That's the best way to do it.  So, as

22  long as you're submitting whatever you're submitting so that

23  it's reviewable as a part of public record, that's fine.

24  Don't submit any CDs or videotapes or anything like that.

25  Okay now --

1    MS. MENZER:  Your Honor, just for the record, so

2  we're going to do it on the 26th?

3    THE COURT:  Right.

4    MS. MENZER:  At what time?

5    THE COURT:  2:30.

6    I am going to block an hour and a half just in case

7  we need a little extra time, but my experience has been 20

8  minutes for an argument is plenty.  Sometimes it gets a

9  little longer or a little shorter.  But that's generally

10  about all that's really necessary, unless there's something

11  you don't even anticipate yourself today.

12    Now, bond status, what's the government's position?

13    MS. MENZER:  Your Honor, we've agreed that

14  Dr. Greer may remain on his personal recognizance.

15    THE COURT:  All right.  What about international

16  travel?

17    MS. MENZER:  I would ask that his passport be

18  turned in, however.  I think that's a reasonable request in

19  that if he is going to travel outside the area, that he

20  notify probation of that.

21    MR. NASSIKAS:  We can consult with probation, Your

22  Honor, just make sure if there is a need for travel, that we

23  get approval from probation.  Does the Court want to also be

24  notified of that or is it sufficient for us to discuss it

25  with probation?

1          THE COURT:  No, I think those are reasonable

2    requests and actually very standard requests.  So, he can

3    submit his passport.  If there's some need that arises that

4    he needs to go somewhere, that you bring it to the

5    probation's attention and the government's.  And if everyone

6    is in agreement, there's not going to be a problem.  If there

7    is a dispute, I will resolve the dispute, obviously but

8    now --

9          MR. NASSIKAS:  I don't anticipate any disputes

10   there, Your Honor.

11         THE COURT:  I'm not expecting it.

12         MR. NASSIKAS:  No.

13         THE COURT:  One point I would make, I've had cases

14   in the past, I'm sad to say, where cases of this type, of

15   this general genre where probation has trouble, let's say,

16   difficulty in getting information from the parties, well,

17   from the defendant and counsel in terms of gaining

18   information they need to prepare their report.

19         So I would rather we not have that kind of a

20   problem here.  But if there's going to be issues of providing

21   the information they need, usually it's financial related,

22   then I'm going to have to deal with that on the front end

23   rather than on the back end.

24         And I interpret the phrase "acceptance of

25   responsibility" to include cooperation in these kind of

1    matters, dealing with U.S. probation, providing them the

2    information they need so they can assess the financial

3    situation of the defendant.  They need to do that or the

4    Court is going to have limited information.  I can't really

5    make a good judgment with regard to things like restitution

6    and fines and things like that.

7            So, I fully expect that there's going to be total

8    cooperation from the defendant.  And I give fair warning

9    about this up front because I interpret the phrase,

10   acceptance of responsibility, to include this.  I don't want

11   to have to have any surprises at a later time if I were to

12   interpret conduct as not constituting acceptance of

13   responsibility.

14           So I'm expecting the defendant to be cooperative,

15   work with probation and with the government to provide

16   whatever information is necessary so that I'm in a position

17   to assess things like fines and restitution and things like

18   that.  I'll just leave it at that.

19           MR. NASSIKAS:  On that point, Your Honor, I can

20   assure the Court that we share the Court's view of what

21   acceptance means and what cooperation is.  I think even Ms.

22   Menzer would say, for the past two years as counsel, we've

23   had a very cooperative relationship with the government,

24   trying to provide and be responsive to information to resolve

25   this case for purposes of probation, of course.

1          In terms of financial information, we already have

2   prepared and Dr. Greer and his wife have prepared detailed

3   financial disclosure forms as part of the civil settlement

4   side of this case, as both Ms. Menzer and Laurie Weinstein,

5   who's worked cooperatively with us and we with her, are fully

6   aware of a very transparent, every effort for us to make

7   transparent every aspect of the Greer's lives.  We understand

8   that's important for the Court and frankly it benefits the

9   Greers.

10          THE COURT:  Yes.  I just want to emphasize that,

11   and of course, let me also emphasize the importance for him

12   to check in once a week by telephone to probation to just let

13   them know he's out there.  Minimal burden to the defendant

14   but just check in by phone once a week.

15          MR. NASSIKAS:  Will we need, Your Honor, to run by

16   the probation office so they just assign an officer or would

17   that already have happened after this?  We're happy to go by

18   the probation office with that request of once a week phone

19   in from the Court.

20          THE COURT:  The Deputy Clerk will work with you in

21   making sure that gets all coordinated.

22          MR. NASSIKAS:  Of course.

23          THE COURT:  That's not going to be a problem.

24          MR. NASSIKAS:  If booking is necessary, Your Honor,

25   otherwise we'll coordinate that with Ms. Menzer and Agent

1    Gordon.

2    THE COURT:  Yeah, work that out with Ms. Menzer and

3    the agents.  They'll handle all that.

4    MR. NASSIKAS:  Your Honor, we do have still those

5    waiver forms.

6    THE COURT:  Yes.  Let me sign those.

7    MR. NASSIKAS:  He needs to sign them.  Your Honor,

8    the Court's indulgence.

9    THE COURT:  Yes, go ahead.

10   MR. NASSIKAS:  Thank you, Your Honor.  I'll hand up

11   the waiver of trial by jury form executed by both Dr. Greer

12   and myself and the waiver of indictment.

13   THE COURT:  Very good.  Thank you.

14   MR. NASSIKAS:  Your Honor, we have one more form to

15   execute from the Deputy Clerk.

16   THE COURT:  All right.  Any questions for the

17   government?

18   MS. MENZER:  No, Your Honor.

19   THE COURT:  Questions for the defendant?

20   MR. NASSIKAS:  No, Your Honor.

21   THE COURT:  We'll stand in recess.

22   (Whereupon, at 12:37 p.m. the proceedings

23   concluded.)

24

25

1          **CERTIFICATE OF REPORTER**

2              I, Lisa Walker Griffith, certify that the

3    foregoing is a correct transcript from the record of

4    proceedings in the above-entitled matter.

5

6

7

8

9

10    _____          7-20-07
      Lisa Walker Griffith, RPR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 07-095 (RJL)** |
| | ) | |
| **DOUGLAS F. GREER, M.D.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**NOTICE REGARDING FILING OF SEALED MATERIAL**

Notice is given that a Sealed Attachment, Exhibit 12, was filed in paper format with the

Court.  This document is not available for public viewing.

Respectfully submitted,

_____
John N. Nassikas III, Bar No. 387167
ARENT FOX LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:  (202) 857-6000
Facsimile:  (202) 857-6395
nassikas.john@arentfox.com

Counsel for Defendant Douglas Greer, M.D.

Dated:  July 26, 2007

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Criminal No. 07-095 (RJL)** |
| | ) | |
| DOUGLAS F. GREER, M.D., | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE REGARDING FILING OF SEALED MATERIAL

Notice is given that a Sealed Attachment, Exhibit 13, was filed in paper format with the Court. This document is not available for public viewing.

Respectfully submitted,

_____
John N. Nassikas III, Bar No. 387167
ARENT FOX LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 857-6000
Facsimile: (202) 857-6395
nassikas.john@arentfox.com

Counsel for Defendant Douglas Greer, M.D.

Dated: July 26, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 07-095 (RJL)** |
| | ) | |
| **DOUGLAS F. GREER, M.D.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**NOTICE REGARDING FILING OF SEALED MATERIAL**

Notice is given that a Sealed Attachment, Exhibit 14, was filed in paper format with the

Court.  This document is not available for public viewing.

Respectfully submitted,

_____
John N. Nassikas III, Bar No. 387167
ARENT FOX LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:  (202) 857-6000
Facsimile:  (202) 857-6395
nassikas.john@arentfox.com

Counsel for Defendant Douglas Greer, M.D.

Dated:  July 26, 2007



June 17, 2007

To Whom it May Concern:
    This information addressed to my late husband,
Rev. Merrill W. Drennan, arrived June 16, 2007

    I am appalled and angered that Susan B.
Menzer, AUSA would send Dr. Green's patients
information pertaining to his plea and suggesting
that they could sue him for financial or emotional
harm.   This is ludicrous!


        Arianne Drennan
    ( Mrs. Merrill W. Drennan)



U.S. Department of Justice

United States Attorney

*District of Columbia*

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20001*

June 12, 2007

Re:    <u>United States v. Douglas Greer</u> Cr. 07-95 (RJL)
       Sentencing Date: July 26, 2007
       U.S. District Court Judge Richard Leon

Dear Patient:

On May 4, 2007, Dr. Douglas Greer pled guilty to a criminal information, charging him with one count of Health Care Fraud and one count of Filing a False Income Tax Return. I have attached a copy of the Statement of Offense that describes the offenses Dr. Greer admitted committing. He is scheduled to be sentenced on July 26, 2007 at 2:30 p.m. in Courtroom 18 of the United States District Court for the District of Columbia, located at 333 Constitution Avenue, N.W.

Although you may have been unaware of Dr. Greer's criminal conduct, you are considered a victim of his health care fraud scheme. In addition to any financial loss you may have suffered by paying Dr. Greer for medically services that he either did not perform or were not medically necessary for your care, you may have needlessly spent time at medical appointments or undergone unnecessary medical diagnostic or surgical procedures.

Your attendance at the sentencing is not required, however, you are welcome to attend if you so choose. If you decide to attend, you may want to check with me a few days before to confirm the date and time and to avoid any inconvenience to yourself in the event of a last minute change in scheduling.

As a victim, you have the right to present a written victim impact statement to assist the court in fairly evaluating the extent of the harm caused by Dr. Greer's criminal conduct. Your statement may include a description of the financial and/or emotional impact which you have suffered. You are not obligated to prepare a statement, but this may be your only opportunity to tell the sentencing judge how the crime affected you.

Enclosed is a **Victim Impact Statement** form. In order for the judge to have time to read your victim impact statement, it must be completed and returned to our office **at least two weeks before the sentencing date, that is no later than July 12, 2007.** You may use the enclosed form or you may write a letter to the judge. Also enclosed is a self-addressed, stamped envelope for you to use in mailing your statement. Your statement will be seen by the defendant

and his or her attorney.  Please let us know if this presents a problem for you.

Many victims find it difficult to write about the crime.  You can call me or La June Thames in the Victim Witness Assistance Unit at (202) 616- 0896 if you have questions or need help writing your Victim Impact Statement.  We are here to assist you.

Sincerely,

Susan B. Menzer
Assistant U.S. Attorney
(202)514-6968

Enclosures

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

MAY 0 3 2007

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| v. | : | Cr. No. 07-095 (RJL) |
| DOUGLAS F. GREER, | : | |
| Defendant | : | |

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Cr. No. 07-095 (RJL)

VIOLATION : 18 U.S.C. §1347 (Health
Care Fraud); 26 U.S.C. § 7206(1) (False
Income Tax :Return)

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, defendant **DOUGLAS F. GREER** agrees and stipulates as follows:

### HEALTH CARE FRAUD

1.    Defendant **DOUGLAS F. GREER** is a medical doctor with a practice specialty in ophthalmology.  He provides medical services for patients in the District of Columbia and the Commonwealth of Virginia.  All insurance claims, however, are prepared and processed in the main office, located at 3301 New Mexico Avenue, N.W., Suite 214, Washington, D.C.

2.    Since approximately 1981, defendant **DOUGLAS F. GREER** has been a participating provider in the Medicare Program.  Medicare is a federal health care program that provides basic medical coverage for persons age 65 and over who are entitled to retirement benefits and for persons under age 65 who suffer from certain disabilities.  The United States funds 100% of Medicare, which is administered by the United States Department of Health and Human Services.  Medicare is a health care benefit program as defined by 18 U.S.C. §§ 24 and 1347.  Between 1999 and 2002, defendant **DOUGLAS F. GREER** provided services to 429 Medicare beneficiaries.

3.      Medicare uses a "fee schedule" to determine the amount it will pay for any given medical service (called the "allowable").  Medicare pays 80% of the fee schedule amount and the patient is responsible for paying the remaining 20% (also known as "co-payment").  Medicare beneficiaries can obtain private secondary insurance to cover these co-payment amounts or they must pay the co-payments out of their personal funds.

4.      In addition to Medicare, defendant **DOUGLAS F. GREER** submitted claims for patients whose services were covered under the Federal Employee Health Benefit Plan (FEHBP), a federally-funded health benefit program for some twelve million federal employees, retirees and their dependents. The United States Office of Personnel Management (OPM) is the federal agency responsible for contracting with third party insurers to administer health benefits to its members.  Defendant **DOUGLAS F. GREER** received payments under FEHBP from the following third party insurers: Aetna, Blue Cross Blue Shield, Mail Handlers Benefit Program, GEHA, and National Association of Letter Carriers.  Defendant **DOUGLAS F. GREER** also submitted claims to Aetna, Cigna, Guardian and United Health Care for patients who were not covered under FEHBP.  All of these insurance plans are considered health care benefit programs as defined by 18 U.S.C. §§ 24 and 1347.  Between 1999 and 2002, defendant **DOUGLAS F. GREER** provided services to approximately 778 subscribers of these various insurance programs.

5.      To obtain reimbursement from Medicare or one of these other insurance carriers, health care providers, including ophthalmologists, indicate the type of services provided by using five-digit codes listed in the Physician's Current Procedural Terminology ("CPT") Code Book, a publication of the American Medical Association.  In addition to designating a particular code

number for office visits, diagnostic tests and surgical procedures, the CPT provides a description

of the services. Ophthalmological services are grouped together. Non-surgical services are

further divided into "general" and "special." General Ophthalmological services include two

levels of eye examinations: intermediate (CPT 92002 for new patient or CPT 92012 for

established patient) and comprehensive (CPT 92004 for new patient or CPT 92014 for

established patient). Both levels of eye examinations are "integrated services, in which the

medical decision making cannot be separated from the examining techniques used."

  6.  Additional diagnostic tests are grouped under "special ophthalmolgical services"

and may be performed and billed separately where a more intensive evaluation of a particular eye

structure or function is medically necessary. Medicare and private insurance programs publish

more detailed guidelines for some general and special ophthalmological services, describing

when and how often these services are medically appropriate and will be approved for payment.

  7.  According to these sources, the following diagnostic procedures are generally only

medically indicated for patients suspected of or suffering from glaucoma: (1) taking multiple

intraocular pressure readings throughout the day (Serial Tonometry - CPT 92100); (2) comparing

intraocular pressure before and after dilation (Provocative Test - CPT 92140); (3) measuring the

patient's angles (Gonioscopy - CPT 92020); and (4) determining if there is any peripheral vision

loss (Visual Field - CPT 92081-83). Defendant **DOUGLAS F. GREER**, however, routinely

submitted claims for these procedures for most of his patients regardless of their medical

conditions. Yet, based upon the diagnostic codes submitted by defendant **DOUGLAS F.**

**GREER** with these claims, only 23% of the payments he received were for performing these

procedures on patients whom defendant **DOUGLAS F. GREER** suspected were at risk for

developing glaucoma or already suffered from the disease. Accordingly, defendant **DOUGLAS F. GREER** fraudulently obtained $282,018 from Medicare and the other insurance programs for these medically unnecessary services.

8.    During the years 1999 through 2002, defendant **DOUGLAS F. GREER** also routinely billed for conducting an extensive study of the back (fundus) of his patients' eyes with an instrument known as an indirect ophthalmoscope (Extended Ophthalmoscopy - CPT 92225). First, this procedure is considered medically indicated for patients suspected of suffering from serious internal eye disorders, particularly those involving the retina. Yet, only 17% of the Extended Ophthalmoscopy claims submitted by defendant **DOUGLAS F. GREER** for reimbursement related to patients suffering from such disorders. Second, the CPT Manual and the local Medicare Carrier specifically require a detailed drawing of the patient's retina as an essential element of the procedure. Because defendant **DOUGLAS F. GREER** failed to make such drawings even where the procedure may have been warranted, he did not perform the service for any of the patients for which he sought reimbursement. By submitting these fraudulent claims to Medicare and the other government insurance programs, defendant **DOUGLAS F. GREER** wrongfully obtained $141,889.

9.    In addition, defendant **DOUGLAS F. GREER** often billed for photographs of the back of the patient's eye (Fundus Photography CPT 92250). These photographs are considered a useful tool in documenting the progression of various ocular diseases, but need not be repeated often since noticeable changes in the fundus are slow to occur. Indeed, defendant **DOUGLAS F. GREER** retained a professional ocular photographer who used the most technologically advanced equipment to take these photographs. In addition to the photographs taken by the

4

ocular photographer, defendant **DOUGLAS F. GREER** submitted claims to Medicare and the

other insurance carriers for photographs defendant **DOUGLAS F. GREER** took with a handheld

camera. Unlike the professional's equipment, this handheld camera often failed to produce

images or produced images of such poor quality that defendant **DOUGLAS F. GREER** could

not have used them for any diagnostic purpose. Since the CPT requires defendant **DOUGLAS**

**F. GREER** to make an interpretation and report based upon the images, he simply could not

have performed this service with respect to all the photographs he claimed to have taken.

Accordingly, for the years 1999 through 2002, defendant **DOUGLAS F. GREER** fraudulently

obtained another $88,686 for services he did not render.

10.    Defendant **DOUGLAS F. GREER** billed Medicare and the above referenced

insurance carriers for numerous ocular surgeries. The vast majority of these surgeries related to

cataracts and glaucoma.

11.    A cataract is an abnormality of the eye, characterized by opacity of the lens; that

is, cloudiness which can interfere with normal vision. For the years 1999 through 2002,

defendant **DOUGLAS F. GREER** surgically removed 136 cataracts through a process known as

phacoemulsification (CPT 66984). Once the cataract is removed, an artificial lens (IOL) is

implanted to perform the same function as the human lens. The surgery is considered routine

with few risks of complications. On rare occasions, in approximately one in 1000

phacoemulsification operations, excessive heat can cause a burn to the white part of the eye (the

scleral), requiring a graft (CPT 67255). In order to increase his billings, defendant **DOUGLAS**

**F. GREER** falsely claimed that during 108 of these surgeries, he was required to perform a

scleral graft to mend the wound. As a result, he fraudulently sought reimbursement and obtained

$37,022 from Medicare and the other insurance programs.

12.    After the removal of the human lens and the insertion of an IOL, approximately half of all cataract patients develop a secondary membrane in the eye, which can become opacified, causing cloudiness in the vision. An ophthalmologist can treat this condition by making a hole in the opacified lens capsule with a Yttrium Aluminum Garnet (YAG) laser to create a pathway through which light can pass through to the retina (Capsulotomy - CPT 66821) Even if opacification occurs, it is not considered medically necessary to perform a Capsulotomy unless a patient suffers from a limitation on pursuing daily living activities. It is seldom medically necessary to perform this procedure less than three months following cataract surgery. In fact, if performed within this time period, Medicare requires its providers to submit documentation with their claims for reimbursement to support medical necessity. Further, Capsulotomies rarely need repeating.

13.    For the years 1999 through 2002, defendant **DOUGLAS F. GREER** sought reimbursement from Medicare and the other insurance carriers for performing Capsulotomies on approximately 89% of his cataract patients. He purportedly performed 82 of these Capsulotomies within three months of cataract surgery, fraudulently circumventing the medical necessity documentation requirement by appending modifier 79 to all these claims, falsely certifying that these Capsulotomies were unrelated to the original cataract surgery. As a result, he received $9,848 for which he was not entitled to. Moreover, defendant **DOUGLAS F. GREER** billed for repeating this laser procedure after the three month period on many of his patients, fraudulently obtaining an additional $10,348.

14.    Glaucoma refers to a group of diseases that have in common optic nerve damage

6

with associated visual field loss for which elevated pressure within the eye (intraocular pressure or IOP) is one of the primary risk factors. Eyes produce a watery fluid (aqueous humor), which flows through the pupil and behind the cornea, draining out through a mesh-like pathway (trabecular) and into the bloodstream. When the fluid can not drain properly, IOP increases which can cause damage to the optic nerve. Once a sufficient number of nerve cells are destroyed, "blind spots", or scotomas, begin to form in the field of vision. Typically, these scotomas first appear in the peripheral field. Later, the central vision can be affected. Once visual loss occurs, it is irreversible.

15.    The most prevalent type of glaucoma is primary open angle ("POAG") where the anterior chamber angle is open, but the trabecular meshwork is not draining properly. Topical medication is the most widely used method for treating POAG. Argon Laser Trabeculoplasty ("ALT" - CPT 65855) is an alternative method used to reduce IOP and prevent further optic nerve damage. With the use of an argon laser beam, an ophthalmologist creates openings in the trabecular meshwork, resulting in an increase of the aqueous outflow. Since ALTs can not be repeated, it is the accepted medical practice to treat just half of the trabecular meshwork - 180 degrees - with laser spots. If successful, the pressure lowering effect can last for several years at which time a second ALT can be performed to the opposite half of the trabecular meshwork.

16.    For the years 1999 through 2002, defendant **DOUGLAS F. GREER** sought reimbursement for performing ALTs from Medicare and the other insurance programs for patients who clearly did not need this service since they were not suffering from POAG. As a result, he fraudulently obtained $39,726 from Medicare and the other insurance programs for these ALT procedures that he either did not perform or performed on patients who did not

7

require them. Further, for some patients defendant **DOUGLAS F. GREER** billed more than the maximum number of ALTs that can or should be performed on any one patient. As a result, defendant **DOUGLAS F. GREER** fraudulently obtained an additional $111,652 from Medicare and the other insurance programs for services that he either did not perform or performed without medical necessity.

17.    Primary angle closure ("PAC"), a rarer form of glaucoma, occurs when the trabecular meshwork functions properly, but is blocked by the iris, preventing the flow of aqueous humor from the eye. A Laser Iridotomy (CPT 66761) is an effective surgical procedure to treat PAC. With a focused beam of light, a small hole is created in the outer edge of the iris, allowing aqueous fluid to flow from behind the iris directly to the anterior chamber of the eye. Because an acute attack can occur suddenly for patients with anatomically narrow angles, it is medically reasonable to perform a Laser Iridotomy prophylactically before any signs of glaucoma manifest. Once performed, repeating the procedure is unnecessary unless the hole previously created by the laser closes.

18.    For the years 1999 through 2002, defendant **DOUGLAS F. GREER** claimed that he performed hundreds of Laser Iridotomies. Yet, a very small number of these procedures were actually performed on patients who either suffered from PAC or had anatomically narrow angles. As a result, defendant **DOUGLAS F. GREER** fraudulently obtained $103,767 from Medicare and the other insurance programs for submitting bills for procedures that were medically unnecessary.

19.    Where Laser Iridotomies can not be used or fails to open a closed angle, another procedure known as a Laser Iridoplasty (CPT 66762) can be performed. During this procedure,

an ophthalmologist uses a laser to mechanically pull the iris away from the trabecular meshwork. For the years 1999 through 2002, defendant **DOUGLAS F. GREER** submitted claims to Medicare and the other insurance programs, seeking reimbursement for performing more than one thousand Laser Iridoplasties. Again, a very small percentage were actually performed on patients who allegedly suffered from PAC or had anatomically narrow angles. As a result, defendant **DOUGLAS F. GREER** fraudulently obtained $186,511 from Medicare and the other insurance programs for submitting bills for procedures that were medically unnecessary.

20.    In total, as a result of his scheme to defraud Medicare and these other insurance programs, defendant **DOUGLAS F. GREER** wrongfully obtained $1,011,467.

TAX FRAUD

21.    For the most part, expenses of the medical practice were paid by check or with an American Express card. In addition to making business related purchases, the credit card was used to make purchases of a personal nature. These purchases varied from everyday living expenses - groceries, dry cleaning, cable and telephone services for their residence, health and beauty supplies and treatment - to large ticket items, such as, family vacations. False entries were made in the corporate records, claiming these credit card purchases were for a variety of business related purposes. For instance, groceries and meals at local restaurants often were booked as general office expenses. Similarly, corporate checks were used for purchases or services for the benefit of defendant **DOUGLAS F. GREER's** family benefit and were falsely entered in the corporate accounting system as business expenses. For example, in 2000, Florence Everetts was paid by corporate check in the amount of $620.82 for landscaping services performed at the Greer family home. This payment was booked in the corporate records as a

payment for "professional fees."

22.    For the years 2000, 2001 and 2002, the same accountant prepared the federal and District of Columbia corporate returns for the medical practice and the individual income tax returns for defendant **DOUGLAS F. GREER**. The accountant relied upon the corporate accounting entries to determine the corporation's deductible expenses. The accountant, where appropriate, subtracted the amounts booked as business expenses from the corporation's gross income to calculate taxable income. In other words, the payment of personal expenses with corporate funds fraudulently reduced the corporation's tax liability for each of these tax years.

23.    The medical practice's payroll was another deductible business expense that reduced the corporate taxable income. Defendant **DOUGLAS F. GREER** added his two children to the corporate payroll and began paying them substantial salaries for performing work of little value. For the years 2000, 2001 and 2002, the Greer children's salaries totaled $76,881. The Greer children never exercised dominion and control over these funds, which were deposited into their parent's accounts or into custodial accounts. The monies deposited into the custodial accounts were used to pay the children's private school tuition.

24.    Further, in 1996, defendant **DOUGLAS F. GREER** added his housekeeper to the payroll. For the years 2000, 2001 and 2002, the housekeeper's salary totaled $10,343 even though she performed no appreciable work on behalf of the medical practice.

25.    Completely aware of these false corporate entries upon which the accountant relied in preparing the federal and District of Columbia corporate income tax returns, defendant **DOUGLAS F. GREER** willfully subscribed under penalties of penalty of perjury to his medical practice's corporate returns for tax years 2000, 2001 and 2002, that he knew included false and

10

fraudulent deductions for business expenses. As a result of these fraudulent deductions, Douglas F. Greer, MD, PC understated the amount of federal and District of Columbia taxes due and owing by $55,324 and $15,766, respectively.

26.     At the end of each calendar year, defendant **DOUGLAS F. GREER** received as compensation a portion of the medical practice's profits. These amounts were included in his Wage and Earning statements (Forms W-2). The payment of personal expenses by the corporation and the amounts paid to his children and housekeeper also should have been included and reported as income on his individual income tax returns. By failing to do so, defendant **DOUGLAS F. GREER** willfully subscribed under penalties of penalty of perjury to his individual federal and District of Columbia income tax returns for tax years 2000, 2001 and 2002, that he knew understated his income.

27.     In addition to understating his income, defendant **DOUGLAS F. GREER** took $56,000 in charitable contributions that he knew he was not entitled to. In 1980, defendant **DOUGLAS F. GREER** incorporated International Vision, Inc., a non-profit organization, "to detect, prevent and treat blinding eye diseases in needy countries through instruction, eye care and treatment." For many years, defendant **DOUGLAS F. GREER** claimed that he performed charitable work for International Vision while he and his family vacationed in the Cayman Islands. Even though defendant **DOUGLAS F. GREER** provided medical care to indigent patients in the Cayman Islands, he knew that the majority of expenses incurred during these vacations were for his family's benefit and not in furtherance of the charitable purpose for which he obtained International Vision's exempt status. In reality, the monies "donated" to International Vision were to pay his own personal expenses and not that of the charity.

11

28.    By failing to report approximately $176,077 income and taking these false and fraudulent charitable deductions, defendant **DOUGLAS F. GREER** filed materially false and fraudulent federal and District of Columbia individual income tax returns for 2000, 2001 and 2002, resulting in an additional tax due and owing of $92,320 to the federal government and $37,115 to the District of Columbia government.

_____

DOUGLAS F. GREER,  Defendant

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Cr. No. 07- |
| | : | |
| DOUGLAS F. GREER, | : | |
| | : | VIOLATIONS: 18 U.S.C. §§1347 & 2 |
| | : | (Health Care Fraud); 26 U.S.C. § 7206(1) |
| Defendant. | : | (False Income Tax Return). |

## INFORMATION

The United States Attorney informs the Court:

## COUNT ONE
## (HEALTH CARE FRAUD)

At all times material to this Information:

### Introduction

1.      Defendant **DOUGLAS F. GREER** is a medical doctor with a practice specialty in ophthalmology.  He provides medical services for patients in the District of Columbia and the Commonwealth of Virginia. All insurance claims, however, are prepared and processed in the main office, located at 3301 New Mexico Avenue, N.W., Suite 214, Washington, D.C.

2.      Since approximately 1981, defendant **DOUGLAS F. GREER** has been a participating provider in the Medicare Program.  Medicare is a federal health care program that provides basic medical coverage for persons age 65 and over and for persons under age 65 who suffer from certain disabilities. The United States funds 100% of Medicare, which is administered by the United States Department of Health and Human Services. Between 1999 and 2002, defendant **DOUGLAS F. GREER** claimed to have provided medically necessary services to 429 Medicare

beneficiaries.

3.    Medicare uses a "fee schedule" to determine the amount it will pay for medically

necessary services (called the "allowable"). Medicare pays 80% of the fee schedule amount and the

patient is responsible for paying the remaining 20% (also known as "co-payment"). Medicare

beneficiaries can obtain private secondary insurance to cover these co-payment amounts or they

must pay the co-payments out of their personal funds.

4.    In addition to Medicare, defendant **DOUGLAS F. GREER** submitted claims for

patients whose medically necessary services were covered under the Federal Employees Health

Benefits Program (FEHBP), a federally-funded health benefit program for some twelve million

federal employees, retirees and their dependents.    The United States Office of Personnel

Management is the federal agency responsible for contracting with third party insurers to administer

health benefits to its members. Defendant **DOUGLAS F. GREER** received payments under

FEHBP from the following third party insurers: Aetna, Blue Cross Blue Shield, Mail Handlers

Benefit Program, GEHA, and National Association of Letter Carriers. Defendant **DOUGLAS F.**

**GREER** also submitted claims to Aetna, Cigna, Guardian and United Health Care (hereinafter

"other insurance plans") for patients whose medically necessary services were covered by third party

carriers other than those administered under FEHBP.    Between 1999 and 2002, defendant

**DOUGLAS F. GREER** claimed to have provided medically necessary services to approximately

778 subscribers of these various insurance programs.

5.    Medicare, FEHBP and the other insurance plans are considered health care benefit

programs as defined by 18 U.S.C. §§ 24(b) and 1347 because they are either a public or private plan

or contract, affecting commerce, under which any medical benefit, item, or service is provided to

-2-

any individual, and includes any individual or entity who is providing medical benefit, item, or service for which payment may be made under the plan or contract.

## The Scheme

6.    Beginning in or about January 1999 and continuing until in or about December 2002, defendant **DOUGLAS F. GREER**, in the District of Columbia and elsewhere, knowingly and willfully planned and executed a scheme or artifice to defraud health care benefit programs, namely, Medicare, Aetna, Blue Cross Blue Shield, Cigna, GEHA, Guardian, Mail Handlers Benefit Program, National Association of Letter Carriers and United Health Care, and to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of these health care benefit programs, in connection with the delivery of or payment for health care benefits, items or services, that is $1,011,467, through the submission of false and fraudulent claims.

## Purpose of the Scheme and Artifice

7.    It was the purpose of the scheme and artifice to defraud that defendant **DOUGLAS F. GREER** would fraudulently obtain money for services which had not been rendered or were not medically necessary.

## Manner and Means of the Scheme

8.    It was part of the scheme that defendant **DOUGLAS F. GREER** would and did bill for services that were not rendered.

9.    It was further part of the scheme that defendant **DOUGLAS F. GREER** would and did bill for services that were not performed in the manner, and to the extent, he sought payment.

10.    It was further part of the scheme that defendant **DOUGLAS F. GREER** would and

-3-

whereas, as he then well knew and believed, his total income and tax liability was greater than the amounts reported, in that, during 2001, defendant **DOUGLAS F. GREER** had received other income of approximately $66,736, which he had failed to report on his 2001 Form 1040.

All in violation of Title 26, United States Code, Sections 7206(1).


JEFFREY A. TAYLOR
United States Attorney
for the District of Columbia


By: _____

SUSAN B. MENZER
Assistant United States Attorney
D.C. Bar # 421007
United States Attorneys Office
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C.  20530
(202) 514-6968

# VICTIM IMPACT STATEMENT

**Please complete the following:**

Your Name: _____

Defendant's Name: _____

Case #: _____

Relationship: _____

Sentencing Date: _____

To the Honorable _____ : Judge's Name

*If you do not wish to make a statement regarding this offense, please sign and date here and send us this form.*

_____          _____

*Signature*                                            *Date*

{You can use this form as a guide or write your statement in letter form to the Judge. Please include the identifying information listed above.  Consider the following:}

How has this crime affected you and those close to you?
{e.g. feelings of anger, rage, blaming self, or family helplessness, vulnerability, fear, paranoia, hopelessness, frustration, loss of trust and faith in the world.}

How has this crime affected your ability to perform your work, make a living, run a household, go to school, or enjoy any other activities you previously performed or enjoyed? {e.g. overreact to situations, overprotective of family members, socially withdrawn, fear of going out in a world that has been proven unsafe.}

If you wish, you may use this space to tell the Judge whatever you would like him/her to know about how it is to be a victim of violent crime; or any other information you would like to share.
{e.g. the stigma of being a victim, media coverage, family reaction, the loss of control.}

Reactions, feelings toward the criminal justice system:
{e.g. How the process impacted on you, how you/your family were treated; e.g.
victim/witness intervention; information on court proceedings and case status; feeling
abandoned by the system, defense attorney's insinuations, how it felt enduring the trial,
seeing the offender face to face (plea bargaining).}

What is your recommendation for sentencing? ( mandatory/maximum):
{ Do you want to be notified what the sentence is, how it computes to actual time served,
when this individual comes up for parole?

**FINANCIAL IMPACT:**

We know that this extremely stressful period of your life cannot be compensated monetarily, however, you may want the Judge to know what costs you have incurred for restitution purposes. Please provide any documentation/verification of those losses in the form of receipts, cancelled checks, insurance claims, etc. This is separate from the possible compensation you might qualify for with the Crime/Victims Compensation Program, (202) 879-4216.

A.    Damaged suffered:

1. Value of Property lost or destroyed (list items).................................. _____

2. Hospital, medical expenses.................................................................. _____

3. Lost income or wages......................................................................... _____

4. Miscellaneous expenses..................................................................... _____

**TOTAL LOSS**.................................................................................. _____

B.    Reimbursement received by collateral private sources:

1. Property Insurance (e.g. automobile insurance)........................... _____

2. Health Insurance including Medical Aid Programs........................ _____

3. Reimbursed Income or Wages........................................................ _____

4. Other (list source and amount, ie Crime Victims Compensation)........... _____

**TOTAL REIMBURSEMENT**............................................................. _____


_____          _____
*Signature*                                        *Date*



A service of the National Library of Medicine
and the National Institutes of Health

My NCBI
[Sign In] [Regis

All Databases     PubMed     Nucleotide     Protein     Genome     Structure     OMIM     PMC     Journals     Bool

Search PubMed                    for                                          Go | Clear

Limits     Preview/Index     History     Clipboard     Details

Display Abstract                    Show 20     Sort by     Send to

All: 1     Review: 0

About Entrez

Text Version

Entrez PubMed
Overview
Help | FAQ
Tutorials
New/Noteworthy
E-Utilities

PubMed Services
Journals Database
MeSH Database
Single Citation
Matcher
Batch Citation
Matcher
Clinical Queries
Special Queries
LinkOut
My NCBI

Related Resources
Order Documents
NLM Mobile
NLM Catalog
NLM Gateway
TOXNET
Consumer Health
Clinical Alerts
ClinicalTrials.gov
PubMed Central

□ 1: J Glaucoma. 2006 Feb;15(1):47-52.                    Related Articles, Links

Wolters Kluwer | Lippincott Williams & Wilkins

Comment in:
- J Glaucoma. 2006 Aug;15(4):346; author reply 346.

## The clinical outcomes of cataract extraction by phacoemulsification in eyes with primary angle-closure glaucoma (PACG) and co-existing cataract: a prospective case series.

**Lai JS**, **Tham CC**, **Chan JC**.

Department of Ophthalmology, United Christian Hospital, Kowloon, Hong Kong SAR, Peoples' Republic of China. laism@ha.org.hk

PURPOSE: To evaluate the clinical outcomes of minimally invasive cataract extraction by phacoemulsification, with primary intraocular lens implantation, in eyes with primary angle-closure glaucoma (PACG) and co-existing cataract. MATERIALS AND METHODS: Consecutive primary angle-closure glaucoma patients with co-existing visually significant cataract were invited to participate in this prospective study. After obtaining informed consent, cataract extraction by phacoemulsification through a clear corneal incision was performed under topical anesthesia. Foldable intraocular lenses were implanted in the same setting. These patients were then followed up for a minimum of 1 year. Outcome measures included intraocular pressure (IOP), requirement for glaucoma drugs, and visual acuity. RESULTS: Twenty-one primary angle-closure glaucoma eyes of 21 patients were recruited. Mean age (+/- SD) was 73.7 +/- 8.1 years (range, 60-87 years). There were 12 female patients and 9 male patients, with 13 right eyes and 8 left eyes. Nine eyes (42.9%) had history of acute primary angle closure. Mean follow-up duration was 20.7 +/- 3.6 months (range, 13-26 months). Intraocular pressure was decreased from a mean preoperative level of 19.7 +/- 6.1 mm Hg (range, 11 mm Hg-40 mm Hg) to 15.5 +/- 3.9 mm Hg (range, 9 mm Hg-26 mm Hg) at final follow-up (P = 0.022) (paired t test). The number of glaucoma eye drops required was decreased from a mean preoperative level of 1.91 +/- 0.77 (range, 1-3) to 0.52 +/- 0.87 (range, 0-3) at final follow-up (P < 0.001) (paired t test). In 10 eyes (47.6%), visual acuity improved significantly after surgery. In 9 eyes (42.9%), visual acuity

remained the same. In 2 eyes (9.5%), visual acuity deteriorated significantly after surgery. Mean cup-to-disc ratio was 0.6 +/- 0.2 (range, 0.3-0.9) preoperatively, and 0.7 +/- 0.2 (range, 0.3-0.9) postoperatively (P = 0.047) (paired t test). CONCLUSIONS: In primary angle-closure glaucoma patients with co-existing cataract, cataract extraction alone (by phacoemulsification) can significantly reduce both intraocular pressure and the requirement for glaucoma drugs.

PMID: 16378018 [PubMed - indexed for MEDLINE]

Display  Abstract                          Show  20        Sort by          Send to

Write to the Help Desk
NCBI | NLM | NIH
Department of Health & Human Services
Privacy Statement | Freedom of Information Act | Disclaimer





A service of the National Library of Medicine
and the National Institutes of Health

www.pubmed.gov

My NCBI
[Sign In] [Regis

All Databases    PubMed    Nucleotide    Protein    Genome    Structure    OMIM    PMC    Journals    Books

Search PubMed    for    Go    Clear

Limits    Preview/Index    History    Clipboard    Details

Display AbstractPlus    Show 20    Sort by    Send to

All: 1    Review 0    ✗

---

**1:** Ophthalmology. 2000 Apr;107(4):698-703.    Links

Comment in:
Ophthalmology. 2001 Mar;108(3):428-9.

### Changes in anterior chamber angle width and depth after intraocular lens implantation in eyes with glaucoma.

Hayashi K, Hayashi H, Nakao F, Hayashi F.

Hayashi Eye Hospital, Fukuoka, Japan. hayashi-ken@hayashi.or.jp

OBJECTIVE: To examine the changes in anterior chamber angle width and depth induced by intraocular lens (IOL) implantation in eyes with angle-closure glaucoma (ACG), in eyes with open-angle glaucoma (OAG), and in eyes with no evidence of glaucoma or ocular hypertension. DESIGN: A comparative, nonrandomized, interventional study. PARTICIPANTS: Seventy-seven eyes with ACG, 73 eyes with OAG, and 74 control eyes undergoing cataract extraction and IOL implantation. INTERVENTION: All eyes underwent phacoemulsification and soft acrylic IOL implantation. MAIN OUTCOME MEASURES: The angle width and depth of the anterior chamber were measured using a Scheimpflug videophotography system before surgery, and at 1 week and at 1, 3, 6, 9, and 12 months after surgery. RESULTS: Before surgery, the mean anterior chamber angle width and depth in the ACG group was less than that in either the OAG or control groups by approximately 10 degrees in angle width and 1.0 mm in depth (P < 0.0001). After cataract extraction and IOL implantation, the angle width and depth increased significantly in all three groups (P < 0.0001). Although the width and depth in the ACG group were still smaller than that in the other groups, the differences decreased to 2 degrees for angle width and 0.3 mm for depth. In addition, no significant differences were found in these values between the OAG and control groups before or after surgery. Furthermore, no significant changes were observed in the angle width or depth in any of the three groups throughout the postoperative observation period. As expected, the mean preoperative intraocular pressure (IOP) in the ACG and OAG groups was higher than that in the control group. After cataract surgery, however, the mean IOP decreased significantly and was almost the same in all three groups at 1, 6, and 12 months after surgery. CONCLUSIONS: The width and depth of the anterior chamber angle in eyes with ACG increased

Related Links

Anterior segment optical coherence tomography for evaluation of changes in anterior chamber angle and depth after intraocular lens implantation in eyes with glaucor[Jpn J Ophthalmol. 2007]

Effect of cataract surgery on intraocular pressure control in glaucoma patient[J Cataract Refract Surg. 2001]

Intraocular lens position and anterior chamber angle changes after cataract extraction in eyes with primary angle-closure glauco[J Cataract Refract Surg. 1997]

New management of angle-closure glaucoma by phacoemulsification with foldable posterior chamber intraocular lens implantation. [Yan Ke Xue Bao. 2000]

Combined phacoemulsification and goniosynechialysis for uncontrolled chronic angle-closure glaucoma after acute angle-closure glaucoma[Ophthalmology. 1999]

See all Related Articles...

significantly after cataract extraction and IOL implantation and became similar to that in eyes with OAG and that in normal eyes, which may lead to the decrease in IOP seen in the postoperative period. No significant changes were observed in angle width and depth in any of the three groups after surgery.

PMID: 10768331 [PubMed - indexed for MEDLINE]

Display  AbstractPlus                    Show  20        Sort by          Send to

Write to the Help Desk
NCBI | NLM | NIH
Department of Health & Human Services
Privacy Statement | Freedom of Information Act | Disclaimer

 

A Service of the National Library of Medicine
and the National Institutes of Health

My NCBI
[Sign In] [Regis

All Databases     PubMed     Nucleotide     Protein     Genome     Structure     OMIM     PMC     Journals     Book

Search PubMed          for                    Go   Clear

Limits     Preview/Index     History     Clipboard     Details

Display AbstractPlus          Show 20     Sort by          Send to

All: 1   Review 0   ✕

---

**1:** Eur J Ophthalmol. 2007 May-Jun;17(3):363-7.                    Links

### Anterior segment optical coherence tomography for evaluation of changes in anterior chamber angle and depth after intraocular lens implantation in eyes with glaucoma.

**Dawczynski J, Koenigsdoerffer E, Augsten R, Strobel J.**

Department of Ophthalmology, University Hospital Jena, Jena, Germany. jens.dawczynski@med.uni-jena.de

PURPOSE: To examine anterior chamber depth (ACD) and anterior chamber angle (ACA) in patients with glaucoma after cataract extraction with an anterior optical coherence tomography (OCT) system. METHODS: A new commercially available 1310 nm infrared light anterior segment OCT system was used for anterior chamber evaluation. Sixty patients (n=20 with primary open angle glaucoma [POAG], n=20 with angle closure glaucoma [ACG], and n=20 with no known glaucoma as control group) with a mean age of 68.8+/-13.9 years undergoing cataract surgery were enrolled. RESULTS: Before cataract surgery, ACD and ACA of the ACG group were significantly lower compared to the POAG and control groups (ACD p<0.005; ACA p<0.005). After cataract extraction, ACD and ACA increased significantly in the ACG group (3.1+/-0.4 mm vs 1.8+/-0.2 mm, p<0.005 and 32.3 degrees +/-7.7 degrees vs 16.0 degrees +/-4.7 degrees , p<0.005). In the POAG and control groups, ACD and ACA also increased postoperatively, but not as much as in the ACG group. After cataract extraction, IOP decreased significantly in the glaucoma groups (ACG: 15.6+/-6.1 vs 18.6+/-5.7 mm Hg, p=0.008; POAG: 16.2+/-3.4 vs 20.7+/-8.0 mmHg, p=0.02) and was almost the same in all three groups after surgery (control group after surgery: 15.2+/-2.8 mmHg). CONCLUSIONS: Both ACD and ACA increased significantly after cataract extraction and IOL implantation. IOP reduction after surgery was higher in the glaucoma groups compared to the control group.

PMID: 17534817 [PubMed - indexed for MEDLINE]

Display AbstractPlus          Show 20     Sort by          Send to

Related Links

Changes in anterior chamber angle width and depth after intraocular lens implantation in eyes...[Ophthalmol...2001]

Visualization of anterior chamber angle dynamics using optical coherence tomography.          [Ophthalmology 2005]

Effect of cataract surgery on intraocular pressure control in glaucoma patie...[J Cataract Refract Surg. 2001]

Intraocular lens position and anterior chamber angle changes after cataract extraction in eyes with primary angle-closure glauc...[J Cataract Refract Surg. 1997]

Anterior chamber depth, iridocorneal angle width, and intraocular pressure changes after uneventful phacoemulsification in eyes without glaucoma and with open iridocorneal angles          [J Cataract Refract Surg. 2004]

See all Related Articles...

Case 1:07-cr-00095-RJL     Document 14-21     Filed 07/26/2007     Page 2 of 2

Department of Health & Human Services
Privacy Statement | Freedom of Information Act | Disclaimer